James F. Hurst (*pro hac vice* forthcoming)
james.hurst@kirkland.com
Diana M. Watral (*pro hac vice* forthcoming)
diana.watral@kirkland.com
Ryan Moorman (*pro hac vice* forthcoming)
ryan.moorman@kirkland.com
Robin McCue (*pro hac vice* forthcoming)
robin.mccue@kirkland.com
James R.P. Hileman (*pro hac vice* forthcoming)
jhileman@kirkland.com
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

David I. Horowitz (S.B.N. 248414)
dhorowitz@kirkland.com
Yungmoon Chang (S.B.N. 311673)
yungmoon.chang@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

Additional Counsel Listed on Signature Page

Attorneys for Plaintiff
Eli Lilly and Company

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELI LILLY AND COMPANY, | ) |
| Plaintiff, | ) |
| | ) Case No.: |
| v. | ) |
| | ) ACTION SEEKING STATEWIDE OR |
| WILLOW HEALTH SERVICES, INC., | ) NATIONWIDE RELIEF |
| Defendant. | ) |

## COMPLAINT

1.    Defendant Willow Health Services, Inc. ("Willow") is a telehealth platform that deceives consumers about its untested, unapproved drugs—risking patient safety and diverting unsuspecting

consumers from safe and effective medicines.  Plaintiff Eli Lilly and Company ("Lilly") brings this lawsuit to stop Willow from engaging in unfair, deceptive, and unlawful conduct.

2. This case is specifically about Willow's marketing and sale of compounded tirzepatide products.  Tirzepatide is the active ingredient found in Lilly's MOUNJARO® and ZEPBOUND®, which are the only FDA-approved tirzepatide medicines.  They have undergone testing in 37 clinical trials.  Lilly's tirzepatide medicines are tested and approved only for under-the-skin injections (not for administration in any oral form), to treat serious diseases (not for cosmetic weight loss), and without additives such as vitamins.

3. Willow's compounded tirzepatide drugs could not be more different.  One is in oral form, rather than an under-the-skin injection.  The other is mixed with additives.  It markets and sells both for "cosmetic weight loss."  And neither has undergone any clinical trials or received FDA approval.  Willow's marketing and sale of its untested and unapproved compounded tirzepatide drugs are unfair, deceptive, false, and misleading in multiple ways—and create a significant risk to patient safety.

4. *First*, Willow unfairly and deceptively sells its compounded tirzepatide drugs to treat "cosmetic weight loss."  But no clinical trial has examined tirzepatide for cosmetic weight loss.  FDA approved MOUNJARO® and ZEPBOUND® only to treat serious diseases:  type 2 diabetes and chronic weight management issues in obese adults and overweight adults with at least one weight-related condition (such as high blood pressure, or type 2 diabetes), as well as obstructive sleep apnea.  Lilly has expressly stated that MOUNJARO® and ZEPBOUND® are not approved for—and should not be used for— cosmetic weight loss.  Willow's marketing and sale of its compounded tirzepatide drugs for cosmetic weight loss are particularly concerning, given that it promises patients weight loss of 20% of their body weight for a patient population who may not be obese or overweight at all.

5. *Second*, Willow unfairly and deceptively markets and sells Tirzepatide Drops, which it describes as "a needle-free alternative to injections, offering powerful weight loss benefits in an easy-to-use, once-daily sublingual form."  Willow claims that its Tirzepatide Drops "promote[] feelings of fullness and reduce[] appetite, leading to weight loss."  Willow even states that Tirzepatide Drops provide "even *more* effective weight loss treatment without injections," necessarily communicating to patients that its untested and unapproved oral drops are somehow *better* than Lilly's FDA-approved medicines.   These

statements are false, and selling Tirzepatide Drops is deceptive.  No clinical study demonstrates that any oral formulation of tirzepatide is safe and effective for human use, much less superior to Lilly's FDA-approved tirzepatide medicines.  Willow is experimenting on consumers with an untested and unapproved product.

6.    ***Third,*** Willow also unfairly and deceptively markets and sells its other tirzepatide drug, Tirzepatide Plus, which it describes as a "[p]remium GLP-1 blend featuring a full dose of Tirzepatide, enhanced with Niacinamide (Vitamin B3) to support weight loss and boost energy levels."  Willow tells consumers that Tirzepatide Plus "helps regulate blood sugar, suppress appetite, and promote fat loss, providing an effective pathway toward weight management" and allows patients to "[l]ose 20% of body weight."  But Willow has no basis to claim it does any of those things; its blend of tirzepatide with additives has never been clinically studied.

7.    ***Fourth***, Willow sells both its Tirzepatide Drops and Tirzepatide Plus with the promise that they are custom-made, "personalized" drugs.  This claim is unfair and deceptive too.  Willow's untested and unapproved drugs are not, in fact, "personalized" at all.  Instead, Willow sells standardized compounded tirzepatide drugs in predetermined dosages, under the false premise that they are "personalized" for each patient.

8.    ***Finally,*** Willow falsely claims that the compounding pharmacies with whom it works pass rigorous evaluations and are subject to the same high standards as, for example, Lilly.  In fact, Willow sources its drugs from compounding pharmacies who have serial records of regulatory violations.  As just one example, FDA determined that one partner pharmacy committed serious regulatory violations by "produc[ing] hazardous drugs without providing adequate cleaning of utensils to prevent cross-contamination"—hardly the "the leading compounding pharmac[y] that pass[es] rigorous evaluations," as Willow claims.

9.    Willow's unfair and deceptive practices endanger patients by luring them away from Lilly's safe and effective FDA-approved medicines in favor of Willow's untested and unapproved drugs—all under false pretenses.  To stop Willow's deception, Lilly brings this action pursuant to California state law and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

**THE PARTIES**

10.     Plaintiff Lilly is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

11.     Defendant Willow is a Delaware corporation with a principal place of business at 1401 Lavaca Street PMB 41529, Austin, TX 78701.

**JURISDICTION AND VENUE**

12.     The Court has subject matter jurisdiction over the Lanham Act cause of action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law cause of action pursuant to 28 U.S.C. § 1367(a), as it is part of the same case or controversy as the federal claim. Additionally, and, in the alternative, this Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $75,000.

13.     Willow operates and conducts business in California by promoting and selling the tirzepatide products at issue in this Complaint to California residents.  Willow requires that patients must be located in "Arizona, California, Florida, Massachusetts, Texas or Pennsylvania in order to use the Services."[1]  Willow's website, "https://www.startwillow.com," also offers users the ability to select "California" as a resident state.[2]

14.     Willow has availed itself of the protections of this state, including by specifying in its terms and conditions for consumers using Willow's services[3] that "[t]hese Terms and any action related thereto will be *governed by the laws of the state of California* . . . .  All claims, legal proceedings, or litigation arising in connection with the Services will be brought solely in the *federal or state courts located in Los Angeles County*, *California*, United States, and you consent to the jurisdiction of and venue in such courts and waive any objection as to inconvenient forum."[4]

---

[1]   Willow, *Terms and Conditions*, https://www.startwillow.com/terms-and-conditions (last visited Mar. 23, 2025).

[2]   Willow, *What state do you live in*, https://app.startwillow.com/account/state (last visited Mar. 23, 2025).

[3]   To be clear, these terms and conditions do not govern Willow's relationship with Lilly, but rather illustrate another way in which Willow subjects itself to jurisdiction here.

[4]   Willow, *Terms and Conditions*, https://www.startwillow.com/terms-and-conditions (last visited Mar. 23, 2025) (emphasis added).

4

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Lilly's claim occurred in this District.  Willow operates and conducts business in California, including by engaging in its unlawful promotion and deceptive sale of tirzepatide products at issue pursuant to several California professional licenses, including but not limited to a physician's license from the Medical Board of California,[5] and by facilitating the purchase and shipping of the at-issue products to California consumers.

<u>**FACT ALLEGATIONS**</u>

**I.      LILLY'S TIRZEPATIDE INJECTABLE MEDICINES**

**A.      Lilly's Long History of Developing and Manufacturing Safe and Effective Medicines**

16.     Lilly is an international medicine company and pharmaceutical manufacturer.  Throughout its nearly 150-year existence, Lilly has pioneered countless life-changing discoveries.  Today, Lilly's medicines help tens of millions of patients across the globe.

17.     Lilly manufactures its medicines under strict controls in state-of-the-art facilities, which employ thousands of highly specialized personnel to ensure that Lilly's medicines meet its rigorous quality and safety standards.  Transforming active pharmaceutical ingredients, or API, into medicine is a complex, methodical, and science-based process.  Lilly follows Current Good Manufacturing Practices ("cGMP") across the design, monitoring, and control of manufacturing processes and facilities—from establishing robust quality management systems to obtaining quality raw materials and detecting and investigating product quality deviations.  Each step—from chemical synthesis of the API to formulation, device assembly, and packaging—requires extensive testing and controls and specialized equipment.

18.     Lilly develops and manufactures its medicines in compliance with FDA oversight, the international gold standard for pharmaceuticals.  It includes rigorous pre-approval testing for safety and effectiveness under specific conditions for use, routine FDA inspections of manufacturing facilities, adverse event reporting obligations, and post-market surveillance and studies.  Additionally, Lilly's medicines must be, and always are, accompanied by important labels, instructions, and warnings, which themselves are approved by FDA.

---

[5]   California Dep't of Consumer Affairs, Med. Bd. of California, Licensing Details For: G 80363, https://search.dca.ca.gov/details/8002/G/80363/776481d955b21443f619936cb247cab0 (last visited Mar. 23, 2025).

**B.**    **The Clinical Trial Process Necessary to Safely Bring Medicines to Market**

19.    Before a new prescription medication can be brought to market, it must be clinically tested through a rigorous series of studies designed to determine whether the medication is safe and effective for people to use and to receive FDA approval.

20.    FDA approval is famously hard to earn.  More than 90% of drug candidates ultimately fail.[6]  It is also an enormously costly and time-intensive process.  "On average, it takes 10–15 years and costs $2.6 billion to develop one new medicine."[7]

21.    To begin, drug sponsors first subject the drug candidate to preclinical testing to determine if the product is reasonably safe for initial use in humans and if the drug candidate exhibits pharmacological activity that justifies commercial development.  Based on the data derived from preclinical testing, the drug sponsor is permitted to move the drug candidate into the clinical trial stage, in which it is tested in human subjects through a series of increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials.

22.    Phase I clinical trials typically evaluate the drug candidate's safety and generate data that will inform a range of doses that are safe for use in further clinical testing.  This determination typically culls a large portion of drug candidates—for example, averaging across diseases, only 52% of drug candidates that make it through Phase I testing will progress to Phase II.[8]

23.    Phase II trials are typically designed to preliminarily establish the effectiveness in addition to further confirming safety of the drug for a particular indication over a range of doses and to develop additional data on its safety.  Another swath of drug candidates is eliminated in Phase II; drug candidates for various diseases that make it through Phase II only progress to Phase III at rates between 15% and 48.1% depending on disease type.[9]  Phase III trials are designed to confirm the safety and effectiveness of a dose identified in Phase II trials in a much larger patient population as well as to monitor side effects.

---

[6]    Biotechnology Innovation Organization, *Clinical Development Success Rates and Contributing Factors 2011-2020* at 3 (Feb. 2021), https://tinyurl.com/bp5mb3xy (hereinafter "BIO 2021").

[7]    PhRMA, *Research and Development Policy Framework* (Sept. 2024), https://tinyurl.com/5eecdtm9.

[8]    BIO 2021 at 7.

[9]    *Id.*

6

24.     Based on the data assembled during development in Phase I, Phase II, and Phase III clinical trials, a sponsor company can then submit a marketing application to FDA called a New Drug Application, where the sponsor requests that FDA approve the drug candidate for sale and marketing in the United States.  The sponsor must detail every ingredient and component in its application to FDA.

25.     Once approved for manufacture and distribution, FDA conducts inspections to monitor compliance with cGMP and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications.  FDA also requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies.  All of this is to ensure that—in FDA's words—"American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."[10]

### C.     MOUNJARO® and ZEPBOUND®

26.     FDA approved MOUNJARO® and ZEPBOUND® pursuant to Lilly's marketing application, which was the culmination of the lengthy and expensive clinical trial process described above that is designed to develop, study, and bring safe medicines to patients.

27.     MOUNJARO® and ZEPBOUND® were approved after nearly a decade of development and have undergone testing in 37 clinical trials.  They are two groundbreaking medicines consisting of a macromolecule Lilly discovered called tirzepatide.  Tirzepatide targets patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors.  Tirzepatide activates both receptors to improve blood sugar control and reduce appetite and food intake.

28.     Both medicines meet critical patient needs.  MOUNJARO® is FDA-approved to treat type-2 diabetes, and ZEPBOUND® is approved to treat chronic weight management and obstructive sleep apnea in certain adults.  Today, Lilly manufactures, markets, and sells MOUNJARO® and ZEPBOUND® throughout the United States, among other places.

29.     MOUNJARO® and ZEPBOUND® are the only FDA-approved medicines containing tirzepatide in the United States.  Lilly's tirzepatide medicines are injectables; they are administered

---

[10]    FDA, *Development & Approval Process* (Aug. 8, 2022), https://www.fda.gov/drugs/development-approval-process-drugs.

7

via under-the-skin injections.  FDA has not approved, and Lilly does not sell, any tirzepatide product in oral form.

## II.    DRUG COMPOUNDING

30.    Compounding is a "practice in which a licensed pharmacist, a licensed physician or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."[11]  For example, if an individual patient is allergic to an ingredient in an FDA-approved medicine, a compounding pharmacy could produce a version of that medication that does not contain the allergen.

31.    As FDA itself makes clear, "[c]ompounded drugs are not FDA-approved."[12]  This means FDA does not review compounded drugs to evaluate their safety, effectiveness, or quality before they reach patients.  Specifically, unlike FDA-approved medications, many compounded drugs are not clinically tested and are not reviewed or approved by FDA for safety and effectiveness.  Further, many compounders are not subject to labeling requirements and need not comply with Current Good Manufacturing Practice regulations.  Additionally, their facilities are not subject to inspections by regulatory authorities, and they have no reporting requirements for adverse events.

32.    For these reasons, FDA has warned that "[c]ompounded drugs . . . do not have the same safety, quality, and effectiveness assurances as approved drugs.  Unnecessary use of compounded drugs . . . exposes patients to potentially serious health risks."[13]  Indeed, FDA recently reiterated that compounded drugs that purport to contain tirzepatide "have not undergone FDA premarket review for safety, effectiveness, and quality, and lack a premarket inspection and finding of manufacturing quality that is part of the drug approval process."[14]  Moreover, compounded drugs prepared at state-licensed

---

[11]    FDA, *Human Drug Compounding* (Dec. 18, 2024), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

[12]    FDA, *Compounding and the FDA: Questions and Answers* (Nov. 15, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[13]    FDA, *Compounding and the FDA: Questions and Answers* (June 29, 2022), https://web.archive.org/web/20220702213650/https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[14]    Letter from Center for Drug Evaluation and Rsch., at 10 (Dec. 19, 2024), https://www.fda.gov/media/184606/download.

pharmacies "are not subject to CGMP requirements and are subject to less robust production standards that provide less assurance of quality."[15]

33.    As compounding of tirzepatide became more prevalent, government agencies have warned the public as to the risks of such products.  For instance, in July 2024, FDA sent a letter to compounding advocacy organizations warning that it has received "reports describing patients who experienced adverse events following the administration of compounded . . . tirzepatide."[16]  Further, an October 2024 FDA statement warned of "multiple reports of adverse events, some requiring hospitalization, that may be related to dosing errors."[17]

34.    Leading organizations, state governments, and foreign governments have also expressed concern.  Thirty-eight state and territory Attorneys General and State Drug Task Forces have all warned the public about the dangers of these unsafe and unapproved products, including compounders using "non-sterile ingredients" and taking "no steps to sterilize them."[18]  The Obesity Society, Obesity Action Coalition, and Obesity Medicine Association issued a joint statement regarding compounded GLP-1 medications, stating, "[u]nfortunately, many of the available alternatives [to GLP-1 therapies], like compounded versions of semaglutide and tirzepatide, are not what they are advertised to be."[19]  The Pediatric Endocrine Society has also advised that "[c]linicians and patients [] should exercise caution when exploring options for non-brand name medications, particularly avoiding the use of non-FDA

---

[15]  *Id*.

[16]  Letter from Shannon Glueck, Branch Chief, FDA Compounding Branch 4, to Philip Dickison, CEO, Nat'l Council of State Boards of Nursing, (July 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf.

[17]  FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (Mar. 17, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[18]  Nat'l Ass'n of Attorneys Gen., *State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs* (Feb. 19, 2025), https://www.naag.org/policy-letter/state-and-territory-attorneys-general-urge-fda-to-take-action-against-counterfeit-and-illegally-sold-glp-1-drugs/; FDA, *FDA warns patients and health care professionals not to use compounded drugs from Fullerton Wellness* (Nov. 1, 2024), https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-patients-and-health-care-professionals-not-use-compounded-drugs-fullerton-wellness.

[19]  Obesity Med. Ass'n, *Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives* (Jan. 8, 2024), https://obesitymedicine.org/blog/leading-obesity-expert-organizations-release-statement-to-patients-on-glp-1-compounded-alternatives/.

approved medications and those that come from non-FDA-approved compounding pharmacies."[20] Similarly, the JAMA Health Forum published a study finding that most websites selling compounded anti-obesity medications exclude important safety information and mislead consumers about the safety and effectiveness of their products.[21]  Other patient and consumer groups have issued similar warnings, including the National Consumers League and the American Diabetes Association, which recommended that patients avoid compounded products "due to uncertainty about their content, safety, quality, and effectiveness."[22]

35.    The issue of unsafe compounded drugs purporting to contain tirzepatide has also received international attention.  Australia recently banned the development and sale of compounded anti-obesity medications due to "increasing community concern" and "increasing reports of patients coming to harm from" compounded weight loss drugs.[23]  The ban—effective October 2024—targets compounded drugs that are "being misrepresented and sold as replica [] Mounjaro®."[24]  As Mark Butler, Australia's Minister for Health, said, "Australians should be able to have faith in the medications they use, including compounded medicines," and the ban "will protect Australians from harm and save lives."[25]  Likewise, the South African government has proposed prohibiting the development of compounded GLP-1s.  South Africa's regulatory authority has "noted with concern the number of compounded, substandard, and/or falsified versions" of tirzepatide products being sold to the public since "[t]he complexity of compounding

---

[20]  Pediatric Endocrine Soc'y, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists* (Jan. 16, 2024), https://pedsendo.org/drug-shortages/statement-on-use-of-compounded-semaglutide-and-other-glp-1-receptor-agonists/.

[21]  Ashwin Chetty et al., *Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists*, JAMA Health Forum (Jan 17, 2025).  Available at https://jamanetwork.com/journals/jama-health-forum/fullarticle/2829225.

[22]  Nat'l Consumers League, *NCL urges the public to heed warnings about unregulated versions of GLP-1 weight loss drugs* (Feb. 4, 2025), https://nclnet.org/the-national-consumers-league-urges-the-public-to-heed-warnings-about-unregulated-versions-of-glp-1-weight-loss-drugs/; American Diabetes Ass'n, *The American Diabetes Association Announces Statement on Compounded Incretin Products* (Dec. 2, 2024), https://diabetes.org/newsroom/press-releases/american-diabetes-association-announces-statement-compounded-incretin#:~:text=The%20statement%20recommends%20against%20using,safety%2C%20quality%2C%20and%20effectiveness.

[23]  Dep't of Health and Aged Care, *Protecting Australians form unsafe compounding of replica weight loss products* (May 22, 2024), https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products.

[24]  *Id.*

[25]  *Id.*

GLP1 agonists, which are sterile medicines containing complex active substances[,] poses a public health and safety risk."[26]

### III.   WILLOW'S UNFAIR, DECEPTIVE, FALSE, MISLEADING, AND UNLAWFUL MARKETING AND SALES OF TIRZEPATIDE

#### A.   Willow's Sale of Compounded Tirzepatide for Cosmetic Use

36.     To start, Willow falsely, deceptively, misleadingly, and unfairly markets and sells its compounded tirzepatide to be used "for cosmetic weight loss"—rather than to treat the serious diseases of diabetes, obesity, and sleep apnea.

37.     Willow claims that it developed the "***first*** GLP-1 treatment program for ***cosmetic*** weight loss."[27]  This necessarily implies that tirzepatide is a safe, effective, and approved treatment for cosmetic weight loss.



38.     Lilly's MOUNJARO® and ZEPBOUND®—the only FDA-approved tirzepatide medicines—are approved to treat type 2 diabetes (MOUNJARO®), and chronic weight management and obstructive sleep apnea (ZEPBOUND®) in certain obese or overweight adults.  FDA has never approved any form of tirzepatide for ***cosmetic*** weight loss.

---

[26]   S. Afr. Health Products Regul. Auth., *SAHPRA's Position on GLP1 and GIP-GLP1 Products That Are Compounded, Substandard And Falsified* (Nov. 8, 2024), https://www.sahpra.org.za/news-and-updates/sahpras-position-on-glp1-and-gip-glp1-products-that-are-compounded-substandard-and-falsifiedas/.

[27]   Instagram advertisement (Mar. 17, 2025) (emphases added).

39.     Recognizing that obesity is a serious disease and should be treated like one, Lilly has repeatedly and expressly stated that MOUNJARO® and ZEPBOUND® are not approved for—and should not be used for—cosmetic weight loss.  In an open letter, Lilly warned against the dangers of using its tirzepatide medicines for cosmetic weight loss.  To ensure patient safety, Lilly also ran an advertisement in *The New York Times* reminding the public that "We are making obesity medications.  But know this is not about cosmetic weight loss."  And during the Oscars, Lilly aired a commercial stating that "[s]ome people have been using medicine never meant for them . . . [f]or the smaller dress or tux, for a big night, for vanity," and "[p]eople whose health is affected by obesity are the reason we worked on these medications.  It matters who gets them."

40.     The dangers of Willow marketing and selling its tirzepatide drugs for treating cosmetic weight loss cannot be understated.  Willow holds its tirzepatide drugs out as a way for patients to "[l]ose 20% of body weight with weight loss that feels natural."[28]  And Willow's Chief Medical Officer, Dr. Michael Green, touts that he lost "18% of [his] body weight" using compounded tirzepatide.[29]  He claims that, by taking compounded tirzepatide, his "brain changed," and "I forget to eat.  I don't really need food that much . . . ."[30]

41.     Willow's advertisements echo Dr. Green's concerning sentiments.  In one advertisement, Willow depicts a mostly empty refrigerator except for an injection vial and needles, stating, "see you in summer with a snatched waist & the smallest bikini ever thx to my GLP-1."[31]  In another, Willow touts how "easy" it is to "sign up for Willow's compounded GLP-1s with an easy 3 min quiz & same day approval," before the poster claims to have "lost more pounds than I expected" and that he or she will "be ready for summer.  You can be too.  Sign up ASAP."[32]

---

[28]   Willow Tirzepatide Plus Product Page, https://www.startwillow.com/compound-tirzepatide (last visited Mar. 23, 2025); Willow Tirzepatide Drops Product Page, https://www.startwillow.com/tirzepatide-drops (last visited Mar. 23, 2025).

[29]   Willow (startwillow), *What Surprised Dr. Green the Most on Tirzepatide*, INSTAGRAM (Mar. 18, 2025), https://www.instagram.com/startwillow/reel/DHWnJ5OI8nL/?hl=en.

[30]   *Id.*

[31]   Instagram advertisement (Apr. 21, 2025).

[32]   Instagram advertisement (Apr. 21, 2025).

 

42.     Willow's and Dr. Green's statements not only make light of the serious conditions FDA has approved tirzepatide to treat, but also invite patients to take drugs where no clinical study supports their safety or effectiveness.  And their statements invite patients to do so in situations where taking those drugs—and losing 18 to 20% of their weight—could place patients at risk, including patients who start treatment at a BMI that is lower than the overweight and obesity thresholds, where no clinical trial data shows that using tirzepatide in such circumstances remains safe and effective.

**B.     Willow's Sale of Tirzepatide Drops**

43.     Next, Willow unfairly, deceptively, misleadingly, and falsely markets and sells its Tirzepatide Drops as a safe and effective as a treatment for patients.

44.     Tirzepatide Drops are what is called a "sublingual" drug, meaning they are taken under the tongue, rather than being injected.

45.    Willow touts the effectiveness of Tirzepatide Drops.  It asserts sublingual tirzepatide "works" because it dissolves and "is absorbed directly into the bloodstream."[33]

**What are Compound Tirzepatide drops?**    —

Compound Tirzepatide drops are administered via daily doses under the tongue. They are a safe and popular alternative for patients that are uncomfortable with self-injections.

Sublingual medication works by placing the drug under the tongue, where it dissolves and is absorbed directly into the bloodstream through the tissues.

The area under the tongue has a rich supply of blood vessels, which allows the medication to bypass the digestive system and liver, leading to faster and more efficient absorption compared to oral medications that are swallowed.

46.    On social media, Willow echoes this message, telling consumers that by using Tirzepatide Drops, "you get all the benefits of GLP-1s,"[34] and that "[t]he drops work nice.  They don't require an

---

[33]    Willow Tirzepatide Drops Product Page, https://www.startwillow.com/tirzepatide-drops (last visited Mar. 23, 2025).

[34]    Willow, *New GLP-1 Drops,* FACEBOOK (Oct. 25, 2024), https://www.facebook.com/61553618379421/videos/1548415222700920/.

14

injection."[35]  It similarly tells consumers its "Weight Loss Drops" are "the needle-free way to shed pounds and feel amazing," adding that "you DON'T need extreme diets or painful injections to see real results!"[36]

47.    It also tells patients the Tirzepatide Drops are safe, describing them as a "safe and popular alternative" to injections.[37]

48.    On top of this, Willow unfairly, deceptively, misleadingly, and falsely relies on "clinical trials" to support the safety and effectiveness of Tirzepatide Drops.  It identifies what it purports to be "[c]ommon side effects of tirzepatide," and expressly references "[c]linical trials" for tirzepatide when discussing Tirzepatide Drops.[38]  Such references to clinical studies necessarily imply that Tirzepatide Drops themselves have been clinically tested.

---

[35]    *Id.*

[36]    Willow (startwillow), *Tirzepatide Drops Launch*, INSTAGRAM (Mar. 10, 2025), https://www.instagram.com/startwillow/reel/DHBlbquI_nq/?hl=en.

[37]    Willow Tirzepatide Drops Product Page, https://www.startwillow.com/tirzepatide-drops (last visited Mar. 23, 2025).

[38]    *Id.*

49.     It similarly uses scientific language to create the necessarily false impression of rigor and effectiveness.  Willow tells consumers that Tirzepatide Drops "[m]imic[] two natural hormones produced in the gut, GLP-1 and GIP, leading to even more effective weight loss treatment without injections."  Willow further states in a section titled "[t]he science behind Tirzepatide Drops" that "Tirzepatide . . . works by targeting two key receptors involved in glucose and energy regulation: . . . [b]y activating these receptors, Tirzepatide enhances insulin secretion in response to meals, inhibits glucagon release, and slows gastric emptying, which helps to control blood sugar levels.  Additionally, it promotes feelings of fullness and reduces appetite, leading to weight loss."[39]

50.     Willow's statements, and its sale of Tirzepatide Drops, necessarily imply to consumers that its oral drug has been tested and proven to work in the manner promoted—which is unfair, deceptive, misleading, and false.

51.     No clinical trial supports these claims or the sale of these drugs, and they jeopardize public health in an alarming way.

52.     Lilly is not aware of any clinical study that has ever evaluated any form of oral tirzepatide. Lilly's FDA-approved tirzepatide medicines are the only ones that have undergone clinical trials, and the safety and effectiveness established by the rigorous clinical trials of any injectable version of tirzepatide do not reliably establish the safety and effectiveness of an oral version of tirzepatide.

53.     There are important differences between oral administration and subcutaneous administrations.  As a result of the different ways injectable and oral medications interact with the human body, the rate of absorption and bioavailability of those drugs (especially over time) necessarily varies. Without any clinical trials of oral tirzepatide, or any bioavailability analysis of any of Willow's products, Willow has no evidence that its oral tirzepatide plays any role in these processes.

54.     Lilly's subcutaneous, under-the-skin injections allow its medicines to enter the bloodstream via injection under the skin.  For ZEPBOUND®, "[f]ollowing subcutaneous administration, the median time (range) to maximum plasma concentration of tirzepatide is 24 hours (8 to 72 hours)."[40] Tirzepatide Drops, by contrast, "are administered via daily doses under the tongue," and Willow claims

---

[39]   *Id*.

[40]   Eli Lilly Zepbound Label (Dec. 2024), https://pi.lilly.com/us/zepbound-uspi.pdf.

that "[s]ublingual medication works by placing the drug under the tongue," and that "[t]he area under the tongue has a rich supply of blood vessels, which allows the medication to bypass the digestive system and liver."[41]  But Willow has no clinical trial support for *any* of that.  Rather, these statements are designed to deceive consumers, unfairly compete, and falsely communicate that Willow's Tirzepatide Drops have been tested and proven to function as advertised and provide the advertised health benefits.

55.    Willow goes even further, stating in its advertising that its Tirzepatide Drops are an "***even more effective*** weight loss treatment without injections."[42]  In other words, Willow is not only claiming to provide a safe and effective alternative treatment but also one that offers *superior* outcomes to ZEPBOUND®, which FDA has approved to treat obesity.  Of course, no clinical studies support this either.

56.    Ultimately, Willow has no evidence of clinical studies to support any of its sales of or claims regarding the safety and effectiveness of its oral treatment, instead attempting to rely on Lilly's FDA-approved ***injectable*** medicines that ***have*** undergone clinical trials for treatment of obese adults, or overweight adults with at least one weight-related condition (such as type 2 diabetes or high cholesterol), ***not*** cosmetic weight loss.  By marketing and selling its untested, unapproved Tirzepatide Drops, Willow deceives and endangers the public.

**C.    Willow's Sale of "Tirzepatide Plus"**

57.    Willow also unfairly, deceptively, misleadingly, and falsely markets and sells its combination drug, Tirzepatide Plus.

58.    Willow describes Tirzepatide Plus as a "premium GLP-1 blend . . . to support weight-loss and boost energy levels."[43]

59.    As with its Tirzepatide Drops, Willow touts the effectiveness of Tirzepatide Plus to consumers.  For example, Willow asserts that its Tirzepatide Plus "may enhance metabolic function, neurological health, and musculoskeletal strength, helping patients maintain vitality and wellness throughout their treatment journey," and "helps regulate blood sugar, suppress appetite, and promote fat

---

[41]    Willow Tirzepatide Drops Product Page, https://www.startwillow.com/tirzepatide-drops (last visited Mar. 23, 2025).

[42]    *Id*.

[43]    Willow Tirzepatide Plus Product Page, https://www.startwillow.com/compound-tirzepatide (last visited Mar. 29, 2025).

loss, providing an effective pathway toward weight management."[44] And under the heading "How does it feel to take Tirzepatide Plus?," Willow claims that consumers will experience "[n]o more random snack cravings," that "[s]maller portions [will] feel just as satisfying," that the "feeling of being full [will] last[] longer after meals," and that "[d]ieting [will] feel[] natural and weight loss [will] seem[] effortless."[45]

60. By citing and discussing clinical trials, Willow unfairly, falsely, misleadingly, and

The science behind **Tirzepatide Plus**

When you eat, the food stimulates your gut to release the GLP-1 hormone. GLP-1 helps lower blood glucose (blood sugar) by triggering insulin release. Insulin helps blood glucose enter your body's cells for later energy use.

In some people, the gut doesn't make enough natural GLP-1, or the brain isn't sensitive to it.

Tirzepatide is a synthetic GLP-1 RA (receptor agonist). A drug that works as an agonist activates the same cell receptors as the body's natural hormones. Semaglutide works in the gut like the body's natural GLP-1, slowing digestion, curbing hunger, and signaling fullness to the brain.

**How does it feel to take Tirzepatide Plus?**

- No more random snack cravings throughout the day
- Smaller portions feel just as satisfying as large ones used to
- The feeling of being full lasts longer after meals
- Dieting feels natural and weight loss seems effortless

deceptively implies that Willow's untested, unapproved Tirzepatide Plus has been established to be safe and effective, when it has not any undergone such trials.

61. Specifically, on a website about Tirzepatide Plus, Willow states that "[c]linical trials suggest that tirzepatide offers superior efficacy in both glucose lowering and weight reduction compared to semaglutide."[46] It also cites to an article from The Lancet stating, "[t]hese highly effective anti-obesity medications are associated with weight losses of more than 10% of overall bodyweight in more than two-thirds of clinical trial participants," and refers to a Harvard Health Publishing article stating, "[i]n studies, a weekly injection caused dramatic amounts of weight loss and improved other heart-related risk factors." Willow goes so far as to claim that consumers using Tirzepatide Plus will lose "20% of body weight."

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

18

62. These statements and express reference to clinical trials necessarily imply that Willow's untested and unapproved Tirzepatide Plus has been tested and studied in clinical trials and has been established to be safe and effective. But in reality, no clinical trial exists at all, much less shows that Willow's compounded tirzepatide injection is safe or effective. In fact, there are no clinical studies on compounded tirzepatide *at all*, much less the combination product Willow sells to patients.

63. Willow also explicitly tells patients that its untested drug is *superior to* Lilly's tested and approved medicines. Willow explicitly states that its manipulated Tirzepatide Plus drug works **better than** Lilly's safe, effective, and FDA-approved medicines. Specifically, immediately after stating that its product has the "[s]ame active ingredient" as MOUNJARO® and ZEPBOUND®, Willow says that Tirzepatide Plus has "better results than Tirzepatide."[47]

Premium GLP-1 blend featuring a full dose of Tirzepatide, enhanced with Niacinamide (Vitamin B3) to support weight loss and boost energy levels.

Same active ingredient as **Mounjaro® & Zepbound®**

Premium, personalized blend with better results than Tirzepatide

**In stock:** Same day prescriptions and free 2-Day shipping

Each batch of medication undergoes **extensive quality checks**

64. In other words, Willow necessarily communicates to consumers that Tirzepatide Plus offers better results than the specific Lilly tirzepatide medications it references by name, MOUNJARO® and ZEPBOUND®. Of course, no clinical studies exist to verify Willow's claims.

65. Furthering its deceptive claims of superiority, Willow's webpage for Tirzepatide Plus markets it as "[g]ame-changing weight loss medication."[48] Willow displays even more quotes from

[47] Willow Tirzepatide Plus Product Page, https://www.startwillow.com/compound-tirzepatide (last visited Mar. 30, 2025).
[48] *Id.*

19

publications, including one from *Medpage Today* that misleadingly suggests Tirzepatide Plus—which has not been subject to clinical studies—is "[t]he most effective drug intervention we have seen for weight management."[49]  This quotation from *Medpage Today*, which did not address Willow's untested, unapproved Tirzepatide Plus product, necessarily implies that Willow's Tirzepatide Plus has been subject to clinical trials and has been shown to be more effective than Lilly's medicines.

66.  Finally, Willow similarly claims its untested and unapproved Tirzepatide Plus is a "[p]remium, personalized blend" that "offers more than just weight loss."[50]  This necessarily implies that its tirzepatide product does *more* than Lilly's FDA-approved injectable medicines.  In essence, Willow

[49]  *Id.*

[50]  *Id.*

20

not only claims that its untested and unapproved "blend" is safe and effective, but also that it is *superior* to medicines such as Lilly's.  This, too, is unfair, false, misleading, and deceptive.

### D.    Willow's Supposedly "Personalized" Compounded Tirzepatide Drugs

67.    Willow also purports to offer "personalized" and "custom-prepared" compounded tirzepatide drugs, but this, too, is unfair, misleading, false, and deceptive.  Willow instead sells mass-manufactured, untested, and unapproved one-size-fits-all compounded drugs.

68.    Willow tells consumers they will receive "GLP-1 weight-loss medication, personalized for you and your body."[51]  It also touts that "[c]ompounded Tirzepatide is a custom-prepared version of the drug, mixed specifically for a patient by a compounding pharmacy."[52]  And in December 16, 2024 and January 8, 2025 Instagram posts, Willow similarly claims to offer "[p]rescription weight loss, made for you."[53]



---

[51]    Willow, *Frequently Asked Questions*, https://www.startwillow.com/faqs (last visited Mar. 23, 2025).

[52]    Willow, *Tirzepatide Overview*, https://docs.startwillow.com/en/articles/9353847-tirzepatide-overview (last visited Mar. 23, 2025).

[53]    Willow (startwillow), *Prescription weight loss, made for you.*, INSTAGRAM (Dec. 16, 2024), https://www.instagram.com/startwillow/p/DDpiBgvxCUk/.



69.    Specifically for Tirzepatide Plus, Willow states it is a "[p]remium, personalized blend." [54]

> ▪▪▪ Premium, personalized blend with better results than Tirzepatide

70.    It likewise describes Tirzepatide Plus as "[s]pecifically crafted for individual patient needs."[55]

> Meet Tirzepatide Plus, our advanced compounded weight loss medication, carefully formulated to combine the innovative benefits of Tirzepatide with additional supportive ingredients. Specifically crafted for individual patient needs, this customized medication offers a personalized therapeutic approach for those who may not tolerate standard formulations or require specialized care.

---

[54]    Willow Tirzepatide Plus Product Page, https://www.startwillow.com/compound-tirzepatide (last visited Apr. 1, 2025).

[55]    *Id.*

71.     These statements necessarily communicate to consumers that Willow's tirzepatide drugs are personalized for consumers based on individual consumer needs.

72.     In reality, there is nothing "personalized" about Willow's compounded tirzepatide drugs. On information and belief, Willow's customers receive compounded tirzepatide manipulated with glycine. Willow does not sell compounded tirzepatide mixed with glycine in any personalized way.  Instead, Willow has its partner pharmacies mix in glycine to compounded tirzepatide at fixed dosages in a standardized way.

73.     Willow's unlawful conduct once again draws the unassuming public away from using clinically tested and FDA-approved medicines like Lilly's under the false impression that Willow's drugs are "personalized."

**E.      Willow's False Advertisements About Its Safety and Quality Standards**

74.     Willow states that that its compounded Tirzepatide Drops and Tirzepatide Plus are "reliable, high-quality medication" and that it "partner[s] with leading compounding pharmacies that pass rigorous evaluations."[56]



75.     This is false, unfair, misleading, and deceptive.  In reality, over the course of several years, FDA and multiple state Boards of Pharmacy have observed persistent safety and quality issues and documented significant regulatory violations at the pharmacies from which Willow sources its tirzepatide drugs.  To be clear, Lilly's allegations are that Willow's *statements* regarding compliance are unlawful. It challenges Willow's claims about its partner pharmacies passing evaluations, not the practices of those pharmacies themselves.

76.     One of Willow's partners is Barclay Luke & Pillai Specialty Pharmacy PLLC d/b/a Meta Pharmacy Services ("Meta Pharmacy").  In 2016, FDA observed Meta Pharmacy's lack of written

---

[56]     Willow Home Page, https://www.startwillow.com/ (last visited Mar. 25, 2025).

23

procedures to ensure sterility, that Meta Pharmacy's facility did not "have the suitable construction to facilitate cleaning, maintenance, and proper operations," that "clothing of personnel engaged in the manufacturing and processing of drug products [was] not appropriate for the duties they perform[ed]," and that Meta Pharmacy lacked quality control measures.[57]  Additionally, FDA expressed concern that "[y]our firm does not maintain a training program," that drugs were not properly tested to ensure conformity to requirements, and that "there [was] a failure to thoroughly review any unexplained discrepancy, whether or not the batch has been already distributed."  FDA further observed that Meta Pharmacy failed to examine packaging and label materials and to test components of its bulk drug substances.

77.    In 2022, FDA observed that Meta Pharmacy's facilities "had difficult to clean and visibly dirty equipment or surface," specifically noting "an accumulation of fibrous material" on work surfaces, "[s]even red-brown apparent splatter marks" on the HEPA filter, and cracks on plastic equipment.[58]  FDA also observed "non-microbial contamination" in the pharmacy's production, including "apparent rust," "uncovered sprinkler heads," "apparent cleaning chemical residue," a "metal exhaust pipe" installed in a "sterile hazardous cleaning room with raised and bubbled foil wrapped around the outside," and "soiled" carts.  Further, FDA expressed concern that there were "unsealed, loose ceiling tiles in your cleanroom" and that Meta Pharmacy failed to perform adequate testing before releasing products.

78.    In 2023, FDA issued a Warning Letter to Meta Pharmacy reiterating significant violations observed during its 2022 inspection.  According to FDA, Meta Pharmacy's drugs were "adulterated under section 501(a)(2)(A) of the FDCA," specifically noting that the drugs "may have become contaminated with filth or rendered injurious to health."[59]  FDA specifically noted that the 2022 "FDA investigator observed significant CGMP violations at your facility."  The Warning Letter recommended that Meta Pharmacy "fully implement corrections that meet the minimum requirements of the CGMP regulations."

[57]    FDA Form 483 to Barclay Luke & Pillai Specialty Pharmacy (Dec. 20, 2016), https://www.fda.gov/media/103231/download.

[58]    FDA Form 483 to Barclay Luke & Pillai Specialty Pharmacy (Dec. 13, 2022), https://www.fda.gov/media/176470/download.

[59]    Letter from Steven E. Porter, Jr., Director, Division of Pharmaceutical Quality Operations IV, to Sean M. Barclay, Owner of Barclay, Luke, and Pillai Specialty Pharmacy, PLLC (Sept. 14, 2023), https://www.fda.gov/media/176472/download.

79.     In 2024, FDA issued a State Referral Letter to the Nevada State Board of Pharmacy regarding "concerns about poor practices observed during an FDA inspection at a pharmacy you licensed"[60] and that Meta Pharmacy was marketing unapproved new drug products and misbranded drug products.  FDA specifically noted that its "FDA investigator observed deviations from appropriate practice standards that, if not corrected, could lead to contamination of drugs, potentially putting patients at risk."

80.     Among other issues, including those noted above, Meta Pharmacy has additionally received violations for: lacking adequate sterilization procedures,[61] failing to "reject" drug products that did not meet established specifications,[62] and "produc[ing] hazardous drugs without providing adequate cleaning of utensils to prevent cross-contamination."[63]  Meta Pharmacy has been noted to have violated regulations by: lacking adequate sterilization procedures,[64] "fail[ing] to thoroughly review any unexplained discrepancy, whether or not the batch has been already distributed,"[65] "ha[ving] difficult to clean and visibly dirty equipment or surface,"[66] and failing to perform adequate testing prior to the release of products,[67] all resulting in "significant CGMP violations at [Meta Pharmacy's] facility."[68]

81.     Another one of Willow's partners is Nevada-based One Way Drug, LLC d/b/a Partell Specialty Pharmacy ("Partell").  In 2014, FDA inspectors observed that Partell lacked adequate sterilization procedures, "appropriate laboratory testing," a written testing program for assessing the stability of drug products, written procedures for cleaning and sanitizing equipment, and procedures

---

[60]   FDA State Referral Letter from Steven E. Porter, Jr., Director, Division of Pharmaceutical Quality Operations IV, to Dave Wuest, Executive Secretary of Nevada State Board of Pharmacy (Mar. 14, 2023), https://www.fda.gov/media/181898/download.

[61]   FDA Form 483 to One Way Drug (May 30, 2014), https://www.fda.gov/media/88497/download.

[62]   FDA Form 483 to One Way Drug (July 19, 2017), https://www.fda.gov/media/107049/download.

[63]   FDA Form 483 to One Way Drug (Mar. 8, 2018), https://www.fda.gov/media/112693/download.

[64]   FDA Form 483 to Barclay Luke & Pillai Specialty Pharmacy (Dec. 20, 2016), https://www.fda.gov/media/103231/download.

[65]   *Id.*

[66]   FDA Form 483 to Barclay Luke & Pillai Specialty Pharmacy (Dec. 13, 2022), https://www.fda.gov/media/176470/download.

[67]   *Id.*

[68]   Letter from Steven E. Porter, Jr., Director, Division of Pharmaceutical Quality Operations IV, to Sean M. Barclay, Owner of Barclay, Luke, and Pillai Specialty Pharmacy, PLLC, (Sept. 14, 2023), https://www.fda.gov/media/176472/download.

describing the handling of written and oral complaints.[69]  Notably, FDA observed that Partell's Quality Assurance/Compliance Supervisor stated himself that "there is 'no rhyme or reason' to determine which drug products he sends out for testing."  Among other violations, FDA observed that "[e]yewear/ goggles are not cleaned, sanitized, and/or sterilized prior to use," some lab technicians "do[n] shoe covers and a nonsterile gown directly over scrubs and shoes . . . worn from the employees [sic] residence," and "open vials containing sterile drug product [that were] not immediately stoppered but were left open for up to 7 minutes."

82.    In 2017, FDA inspectors observed that Partell lacked written procedures to establish the cleaning and maintenance of equipment, failed to "reject" drug products that did not meet established specifications, and did not perform "appropriate laboratory determination of satisfactory conformance to the final specifications" of drug products released.[70]  Again, FDA noted a Partell lab manager's egregious statements that "there are no procedures, and that potency testing is conducted on a random schedule with randomly selected drug products."

83.    In 2019, FDA issued a Warning Letter to Partell reiterating significant violations observed during its 2017 and 2018 inspections.  FDA noted that, in response to recorded violations at its compounding facility, Partell "ceased all sterile compounding activities" and "initiated a voluntary recall of all its sterile compounded prescriptions" in 2018.[71]

84.    In March 2018, FDA inspectors again observed that Partell lacked adequate sterilization measures and even "produced hazardous drugs without providing adequate cleaning of utensils to prevent cross-contamination."[72]  FDA stated that Partell must "take prompt action to correct violations" should it resume sterile operations, or otherwise face legal action.[73]

---

[69]  FDA Form 483 to One Way Drug (May 30, 2014), https://www.fda.gov/media/88497/download.

[70]  FDA Form 483 to One Way Drug (July 19, 2017), https://www.fda.gov/media/107049/download.

[71]  Letter from Steven E. Porter, Jr., Director, Division of Pharmaceutical Quality Operations IV, to Robert A. Seik, CEO and Owner of One Way Drug LLC (Feb. 4, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/one-way-drug-llc-dba-partell-specialty-pharmacy-573455-03132019.

[72]  FDA Form 483 to One Way Drug (Mar. 8, 2018), https://www.fda.gov/media/112693/download.

[73]  Letter from Steven E. Porter, Jr., Director, Division of Pharmaceutical Quality Operations IV, to Robert A. Seik, CEO and Owner of One Way Drug LLC (Feb. 4, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/one-way-drug-llc-dba-partell-specialty-pharmacy-573455-03132019.

85.    In November 2019, FDA inspectors again observed that Partell "produced hazardous drugs without providing adequate containment, segregation, cleaning of work surfaces and cleaning of utensils to prevent cross-contamination."[74]

86.    In summary, Willow advertises to consumers that its partner pharmacies "pass rigorous evaluations." This is false based on its history of past violations *already established*.

**IV.    WILLOW'S UNLAWFUL CONDUCT HARMS CONSUMERS AND LILLY**

87.    Willow's unfair, deceptive, misleading, and false promotion and sale of untested and unapproved Tirzepatide Drops and Tirzepatide Plus have harmed Lilly and consumers. That harm will continue if unchecked.

88.    *First*, Willow's unfair, deceptive, misleading, and false practices risk patient safety. Willow unfairly, deceptively, misleadingly, and falsely markets and sells (i) untested and unapproved oral tirzepatide drops and compounded tirzepatide injections to treat cosmetic weight loss, (ii) untested and unapproved oral tirzepatide drops as safe and effective, and (iii) untested and unapproved Tirzepatide Plus as safe and effective. It also falsely states (iv) Willow's tirzepatide drugs are at least equivalent to, if not superior to, Lilly's FDA-approved medications, (v) Willow's tirzepatide drugs are personalized to fit patients' unique needs, and (vi) Willow partners only with pharmacies that "pass rigorous evaluations," when they are not "reliable" or "high quality" (and Willow's partner pharmacies have received multiple violations).

89.    *Second*, Willow's unfair, deceptive, misleading, and false practices, including its false and misleading statements, cause irreparable harm to Lilly's brand and customer goodwill by promising results that consumers cannot obtain from Willow's product. Willow promotes its Tirzepatide Drops and Tirzepatide Plus by trading on the credibility—earned through decades of safe and effective pharmaceutical manufacturing and years of clinical research and testing on tirzepatide specifically—of FDA-approved MOUNJARO® and ZEPBOUND®. When consumers experience any negative results from Willow's Tirzepatide Drops and Tirzepatide Plus, they may conclude that any tirzepatide is ineffective. Worse still, if consumers are harmed using compounded tirzepatide products, including by

---

[74]    FDA Form 483 to One Way Drug (Nov. 24, 2019), https://www.fda.gov/media/137571/download.

becoming underweight and experiencing the harmful side effects associated therewith, consumers may even draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines.  Relatedly, Willow's false and misleading claim that tirzepatide is appropriate for cosmetic weight loss leads consumers to believe that Lilly's FDA-approved medicines are appropriate for that use.  Cosmetic weight loss is not an approved indication for MOUNJARO® or ZEPBOUND®.  Suggesting otherwise harms Lilly's brand and customer goodwill by leading consumers to believe that Lilly's medicines are medications for cosmetic purposes, not rigorously studied medical treatments for serious health conditions.

**FIRST CAUSE OF ACTION**
**Unfair Competition**
**in Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 *et. seq.***

90.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

91.    The California Unfair Competition Law applies when a plaintiff suffers injury from a competitor's unfair act or practice, including through an act that threatens or harms competition.

92.    The deceptive and unfair business practices that Willow employs to promote and sell its Tirzepatide Drops and Tirzepatide Plus constitute violations of the California Unfair Competition Law.

93.    Willow employs deceptive, unfair, and unlawful business practices by marketing and selling: (i) untested and unapproved oral tirzepatide drops and compounded tirzepatide injections to treat cosmetic weight loss, (ii) untested and unapproved oral tirzepatide drops as safe and effective; (iii) untested and unapproved Tirzepatide Plus as safe and effective; (iv) implying Willow's tirzepatide drugs are at least equivalent to, if not superior to, Lilly's FDA-approved medications, (v) falsely stating Willow's tirzepatide drugs are personalized to fit patients' unique needs, and (vi) falsely stating Willow partners only with pharmacies that "pass rigorous evaluations," when they are not "reliable" or "high quality" (and Willow's partner pharmacies have received multiple violations).

94.    In doing so, Willow lures consumers away from obtaining safe and effective treatment, such as Lilly's FDA-approved tirzepatide medicines.  Willow's unfair, deceptive, and unlawful conduct is putting health, safety, and lives at risk.

95.    Willow's unfair conduct is interfering with Lilly's ability to conduct its business.  As a direct and proximate result of Willow's unfair business practices, Lilly is suffering immediate and continuing, competitive, irreparable injury for which no adequate remedy at law exists.

96.    As a direct and proximate result of Willow's deceptive and unfair business practices, Willow has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.  Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

97.    Lilly is entitled to all remedies available under the California Unfair Competition Law, including injunctive relief, restitution, and attorneys' fees.

## SECOND CAUSE OF ACTION
### False Advertising
### in Violation of the California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17500 *et. seq.*

98.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

99.    The California Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising."

100.    Willow's unfair, deceptive, untrue, and misleading advertising violates Cal. Bus. & Prof. Code § 17500.

101.    Willow misleads California consumers through its marketing and selling of tirzepatide drugs, marketing and selling (i) untested and unapproved oral tirzepatide drops and compounded tirzepatide injections to treat cosmetic weight loss, (ii) untested and unapproved oral tirzepatide drops as safe and effective; (iii) untested and unapproved Tirzepatide Plus as safe and effective.  It also falsely states (iv) Willow's tirzepatide drugs are at least equivalent to, if not superior to, Lilly's FDA-approved medications, (v) Willow's tirzepatide drugs are personalized to fit patients' unique needs, and (vi) Willow partners only with pharmacies that "pass rigorous evaluations," when they are not "reliable" or "high quality" (and Willow's partner pharmacies have received multiple violations).

102.    Willow's untrue statements are unfair, deceptive, untrue, and misleading because, among other things, they steer patients seeking weight loss treatments from obtaining safe, effective, and FDA-approved treatments.  Willow's unlawful conduct is putting health, safety, and lives at risk.

103.    Willow's consumer-oriented conduct actually or has likely misled consumers and is likely to continue to mislead them.

104.    Willow knew or should have known that its misleading conduct actually or has likely misled consumers and is likely to continue to mislead them.

105.    Willow's false advertising conduct is interfering with Lilly's ability to conduct its business.  As a direct and proximate result of Willow's false and misleading statements, Lilly is suffering immediate and continuing, competitive, irreparable injury for which no adequate remedy at law exists.

106.    As a direct and proximate result of Willow's false advertising practices, Willow has unfairly benefitted and profited from sales it made as a result of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines.  Lilly has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

107.    Lilly is entitled to all remedies available under the California Unfair Competition Law, including injunctive relief, restitution, and attorneys' fees.

### THIRD CAUSE OF ACTION
### False or Misleading Advertising and Promotion
### in Violation of 15 U.S.C. § 1125(a)(1)(B)

108.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

109.    Willow's commercial advertising claims described herein are false and misleading in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Willow falsely and deceptively promotes its tirzepatide products as safe and effective, falsely and deceptively promotes its tirzepatide products as having superior benefits over Lilly's FDA-approved tirzepatide medications, falsely and deceptively promotes its tirzepatide products as "personalized" when they are not, and falsely advertises that its partner pharmacies pass rigorous evaluations, despite the fact that regulatory authorities have concluded otherwise on multiple occasions.

110.    Willow has made materially false statements to sell its Tirzepatide Plus and its Tirzepatide Drops.  These statements have influenced and are likely to continue to influence consumers' purchasing decisions—specifically, decisions to purchase Willow's Tirzepatide Plus and Tirzepatide Drops instead of Lilly's FDA-approved medicines.  Willow is steering patients with serious diseases like diabetes and obesity away from obtaining safe, effective, available, and FDA-approved treatments.  Willow's unlawful conduct is putting health, safety, and lives at risk.

111.    Willow's advertisements and business practices actually deceive or have the tendency to deceive consumers.

112.    Willow has caused its false statements to enter interstate trade or commerce.

113.    As a direct and proximate result of Willow's false and deceptive campaign, Lilly is suffering immediate and continuing irreparable injury for which no adequate remedy at law exists.

114.    As a direct and proximate result of Willow's false and deceptive campaign, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the loss of goodwill.

115.    Given Willow's conduct, this is an exceptional case under 15 U.S.C. § 1117.

116.    Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Willow's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

## JURY DEMAND

Lilly hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Lilly prays that this Court enter judgment in Lilly's favor on its claims and award Lilly relief including:

1.    An order declaring that Willow:

   i.    Engaged in unfair competition in violation of the California Unfair Competition Law;

   ii.    Engaged in unlawful conduct by false advertising in violation of the California Unfair Competition Law; and

   iii.    Engaged in false advertising, in violation of 15 U.S.C. § 1125(a)(1)(B).

31

2.     An injunction preliminarily and then permanently enjoining and restraining Willow, and its officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them from:

    i.    Marketing, distributing, dispensing, selling, or otherwise making available to consumers Willow's Tirzepatide Drops and Tirzepatide Plus for cosmetic weight loss;

    ii.    Marketing, distributing, dispensing, selling, or otherwise making available to consumers Willow's Tirzepatide Drops;

    iii.    Marketing, distributing, dispensing, selling, or otherwise making available to consumers any form of Willow's Tirzepatide Plus;

    iv.    Claiming or representing that Willow's tirzepatide drugs are custom-made for a patient's specific needs;

    v.    Claiming or representing that Willow's partner compounding pharmacies pass rigorous evaluations; and

    vi.    Engaging in any acts of false advertising or unfair competition with respect to any tirzepatide product.

3.     An order requiring Willow, and its officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them, to engage in corrective advertising by informing consumers that:

    i.    Willow's Tirzepatide Drops and Tirzepatide Plus have never been demonstrated to be safe or effective treatment for cosmetic weight loss;

    ii.    Willow's Tirzepatide Drops and Tirzepatide Plus have never been demonstrated to be safe or effective;

    iii.    Willow's Tirzepatide Drops and Tirzepatide Plus have never been studied in clinical trials;

    iv.    Willow's Tirzepatide Drops and Tirzepatide Plus do not have any proven therapeutic effect;

    v.    Willow's Tirzepatide Drops and Tirzepatide Plus have not been clinically shown to be as effective as, or more effective than, any FDA-approved tirzepatide medicines;

    vi.    Willow's Tirzepatide Drops and Tirzepatide Plus are not custom-made, uniquely made, or personalized for an individual patient; and

    vii.    Willow's partner compounding pharmacies do not pass rigorous evaluations.

32

4.      An order directing Willow to file with this Court and serve on Lilly's attorneys, within thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the Court's injunction.

5.      An order requiring Willow to account for and pay to Lilly any and all profits arising from the foregoing acts of unfair competition, false advertising, and other applicable laws.

6.      An order requiring Willow to pay Lilly compensatory damages in an amount as yet undetermined caused by the false advertising for payment to Lilly in accordance with 15 U.S.C. § 1117 and other applicable laws.

7.      An order requiring Willow to pay Lilly restitution in an amount as yet undetermined caused by the unfair competition and/or false advertising for payment to Lilly in accordance with California Unfair Competition Law and other applicable laws.

8.      An order for pre-judgment and post-judgment interest on all damages.

9.      An order finding that Willow's actions are exceptional under 15 U.S.C. § 1117.

10.     An order requiring Willow to pay Lilly's costs and attorneys' fees in this action pursuant to 15 U.S.C. § 1117 and any other applicable provision of law.

11.     Other relief as the Court may deem appropriate.

*[Signature page follows.]*

Dated:  April 23, 2025

Respectfully submitted,

*/s/ David I. Horowitz*
David I. Horowitz

James F. Hurst (*pro hac vice* forthcoming)
Diana M. Watral (*pro hac vice* forthcoming)
Ryan Moorman (*pro hac vice* forthcoming)
Robin McCue (*pro hac vice* forthcoming)
James R.P. Hileman (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
james.hurst@kirkland.com
diana.watral@kirkland.com
ryan.moorman@kirkland.com
jhileman@kirkland.com

Joshua L. Simmons (*pro hac vice* forthcoming)
Jeanna M. Wacker (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com

David I. Horowitz (S.B.N. 248414)
Yungmoon Chang (S.B.N. 311673)
KIRKLAND & ELLIS LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
dhorowitz@kirkland.com
yungmoon.chang@kirkland.com

*Attorneys for Plaintiff*
*ELI LILLY AND COMPANY*

34