1  James F. Hurst (admitted *pro hac vice*)
   james.hurst@kirkland.com
2  Diana M. Watral (admitted *pro hac vice*)
   diana.watral@kirkland.com
3  Ryan Moorman (admitted *pro hac vice*)
   ryan.moorman@kirkland.com
4  Robin McCue (admitted *pro hac vice*)
   robin.mccue@kirkland.com
5  James R.P. Hileman (admitted *pro hac vice*)
   jhileman@kirkland.com
6  KIRKLAND & ELLIS LLP
   333 West Wolf Point Plaza
7  Chicago, Illinois 60654
   Telephone: (312) 862-2000
8  Facsimile: (312) 862-2200

9  David I. Horowitz (S.B.N. 248414)
   dhorowitz@kirkland.com
10 Yungmoon Chang (S.B.N. 311673)
   yungmoon.chang@kirkland.com
11 KIRKLAND & ELLIS LLP
   2049 Century Park East
12 Suite 3700
   Los Angeles, CA 90067
13 Telephone: (310) 552-4200
   Facsimile: (310) 552-5900

14
15 Additional Counsel Listed on Signature
   Page

16 *Attorneys for Plaintiff*
   *Eli Lilly and Company*

17

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

19

| | |
|---|---|
| 20  ELI LILLY AND COMPANY, | Case No. 2:25-cv-03570-AB-MAR |
| 21          Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| 22  v. | |
| 23  WILLOW HEALTH SERVICES, INC., | 1. **FALSE OR MISLEADING ADVERTISING AND PROMOTION IN VIOLATION OF 15 U.S.C. § 1125(A)(1)(B).** |
| 24          Defendant. | |

25
26
27
28

1.      Defendant Willow Health Services, Inc. ("Willow") is a telehealth platform that offers weight loss treatments to potential patients.  However, instead of candidly informing consumers about the true nature, characteristics, and qualities of its medicines—which, in fact, are untested, unapproved and unproven compounded "blends" that purport to offer the same outcomes as clinically tested and FDA-approved medicines without any basis in fact or science—Willow has engaged in a widespread false advertising campaign in a calculated effort to deceive consumers about the inherent nature of its tirzepatide-based weight loss treatments.  Indeed, throughout its advertising, Willow dupes consumers, expressly and implicitly telling unsuspecting potential patients that its untested, unapproved tirzepatide-based weight-loss treatments are clinically tested and proven safe and effective for weight loss when they are not.  Plaintiff Eli Lilly and Company ("Lilly") therefore brings this action to remedy its injury from and protect its customers and the consumer public from Willow's dangerous, deceptive, and unlawful practices related to the sale of those treatments.

2.      For nearly 150 years, Lilly has developed and delivered trusted and innovative medicines that save and improve patients' lives.  Lilly's proprietary MOUNJARO® and ZEPBOUND® are two first-of-their-kind medicines indicated for serious conditions afflicting millions of Americans.  Approximately one in ten Americans have type 2 diabetes, and four in ten Americans are obese.  To advance the treatment of these chronic conditions, Lilly used its extensive experience and years of research to develop a new class of medicines that target patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors.  These medicines activate both receptors to improve blood sugar control and reduce appetite and food intake.[1]  FDA has approved these medicines for specific, indicated conditions and populations: MOUNJARO® for

---

[1]    FDA, *FDA Approves Novel, Dual-Targeted Treatment for Type 2 Diabetes* (May 13, 2022), https://web.archive.org/web/20221028212253/https://www.fda.gov/news-events/press-announcements/fda-approves-novel-dual-targeted-treatment-type-2-diabetes; FDA, *FDA Approves New Medication for Chronic Weight Management* (Nov. 8, 2023), https://www.fda.gov/news-events/press-announcements/fda-approves-new-medication-chronic-weight-management.

adults with type 2 diabetes, and ZEPBOUND® to treat chronic weight management and obstructive sleep apnea in certain adults.

3.    Both MOUNJARO® and ZEPBOUND® contain the active pharmaceutical ingredient tirzepatide.  MOUNJARO® and ZEPBOUND® are the *only* FDA-approved medications that contain tirzepatide.  MOUNJARO® and ZEPBOUND® are administered exclusively by subcutaneous injection.  Before obtaining FDA approval for MOUNJARO® and ZEPBOUND®, Lilly undertook years of randomized controlled clinical trials evaluating the safety and effectiveness of its tirzepatide medicines administered by subcutaneous injection on thousands of patients.

4.    Willow's competing compounded tirzepatide drugs—which include both an injectable drug that is mixed with additives ("Willow's Tirzepatide Treatment") and an oral drug ("Willow's Tirzepatide Drops")—have not been studied or approved.  Neither has undergone any clinical trials or received FDA approval.  In fact, unlike MOUNJARO® and ZEPBOUND®, neither of Willow's tirzepatide-based drugs  is approved or even reviewed by FDA, nor has either been tested or clinically proven to result in demonstrable weight loss.

5.    Nevertheless, throughout its advertising Willow explicitly and falsely represents to consumers, for example, that its Tirzepatide Treatment has been the subject of "extensive testing," is supported by "science," has proven outcomes that result in 20% loss of body weight, and is backed by board-certified doctors—complete with images of a doctor in scrubs.  These statements, individually and collectively, falsely communicate to consumers that Willow's Tirzepatide Treatment has been tested, scientifically studied, and clinically proven to result in weight loss.[2]

---

[2]    As discussed further herein, in addition to selling its injectable Tirzepatide Treatment, Willow also offers to consumers an "oral drop" format of tirzepatide, Tirzepatide Drops. In fact, for over six months, Willow promoted this unapproved sublingual tirzepatide as an effective, "safe and popular alternative" to injectable tirzepatide that offered "premium weight loss without injection" and explicitly referenced the "Science Behind Tirzepatide Drops" when no such testing or "science" exists. After the filing of this suit, Willow removed the link to the drops from its webpage, however the product can be easily found by searching for tirzepatide drops on Google, and the product is still offered

6.      Willow's advertising claims are powerful establishment claims, *i.e.*, claims that expressly and implicitly tell consumers that Willow actually has tests and studies to prove that ***Willow's Tirzepatide Treatment itself has specific, measurable, and scientifically valid results showing weight loss***.  Establishment claims are statements that say or suggest that a product's effectiveness or other attributes are supported by testing, making them particularly persuasive to consumers.  That is why the law is clear: failure to have the testing referenced in advertising renders claims false.  Yet, although Willow legally and logically must actually have the testing that it touts to consumers, it has no such testing.  Therefore, its claims that its Tirzepatide Treatment has been clinically tested and scientifically proven are false and misleading.

7.      Further, Willow tells consumers that its untested, unproven Tirzepatide Treatment is "***better***" than Lilly's tirzepatide-based medicines. In fact, Willow expressly states that its product is a "premium, personalized blend with ***better*** results than Tirzepatide."  And immediately following that bold and false claim of superiority, Willow reinforces to consumers that its "medication undergoes extensive testing."  The only undeniable message communicated in Willow's advertising is that it has testing that proves its compounded blend offers superior results to Lilly's own tirzepatide-based medicines.  Again, Willow has no such testing.  In fact, there is no clinical study assessing the effectiveness and outcomes of Willow's Tirzepatide Treatment at all, much less in comparison to Lilly's FDA-approved tirzepatide-based medicines, and Willow's claims regarding the alleged superiority of its "blend" are false.  Given that Lilly offers its FDA-approved medicines at a comparable price point—including offering its starter dose at a *lower* monthly price than Willow's and by offering more dosage strengths—Willow's false claims of superiority are indisputably both intended and likely to steer deceived customers to Willow's product over Lilly's FDA-approved medicines.

_____

for sale through that link on Willow's website. Willow, *Tirzepatide Drops Product Page*, https://www.startwillow.com/tirzepatide-oral (last visited Sept. 25, 2025).

8.    Importantly, *Willow now acknowledges that its unapproved drugs are untested, have not been shown to produce specific results, and have not been shown to be even equivalent, much less superior, to Lilly's FDA-approved medicines.* After Lilly filed this suit, Willow added an inconspicuous statement to the bottom of its website that reads:

> The products offered by Willow are compounded medications prepared by licensed compounding pharmacies. These formulations are not approved by the U.S. Food and Drug Administration (FDA) and have not undergone clinical trials to evaluate their safety, efficacy, or therapeutic equivalence to any FDA-approved medications. They are not intended to diagnose, treat, cure, or prevent any disease and are not substitutes for FDA-approved medications such as MOUNJARO®, ZEPBOUND™, Wegovy®, or Ozempic®. Any claims regarding effectiveness, safety, or weight loss benefits relate only to general mechanisms of the active ingredients (e.g., tirzepatide or semaglutide) and do not pertain to Willow's specific compounded formulations. These products are not approved for cosmetic weight loss and should only be used under the supervision of a licensed healthcare provider. By purchasing or using these products, you acknowledge and accept these terms.[3]

In other words, Willow concedes that any claim that its products are clinically tested is false, and thus any consumer who takes away that message from Willow's advertising is deceived. Willow's attempt to hide this critical information through a tiny print disclaimer at the very bottom of its lengthy webpage, such that no reasonable consumer will see or read it, does not mitigate its current false advertising, and certainly does not cure its past misconduct. It also does nothing to cure the customer deception and confusion caused by advertising statements like the below.



_____

[3]    Willow, *Tirzepatide Product Page*, https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025).

9.     Willow also tries to steer consumers away from Lilly's FDA-approved medicines to its own untested and unapproved compounded Tirzepatide Treatment with the false promise that Willow's Tirzepatide Treatment is specifically and individually made uniquely for each patient.  For example, Willow falsely claims, "[a]t Willow, we believe every patient deserves treatment that's tailored to their unique needs. By using precision medicine to personalize trusted, clinically proven medications, we're helping people get care that truly fits—so they can feel their best and live life to the fullest."[4]  Willow also expressly tells consumers that Willow's Tirzepatide Treatment is "designed for those whose health profiles or goals require clinical personalization."[5]  Even worse, as noted above, Willow tells patients that the result of this alleged medicine is a "[p]remium weight loss medication with a personalized formulation that combines GLP-1 and GIP for even better results."[6]

10.     By claiming that it "personalizes" "trusted, clinically proven medications"— an obvious and undeniable reference to Lilly's FDA-approved medicines—Willow is directly and falsely positioning its untested product as superior to Lilly's product because of Willow's purported personalization. The only message communicated by Willow's advertising is that its Tirzepatide Treatment contains Lilly's clinically proven medicines, yet Willow's products are compounded from a bulk active pharmaceutical ingredient (API), which is produced by someone other than Lilly—the *only* clinically tested tirzepatide API—and is not clinically studied, tested, or produced in conditions comparable to Lilly's actual clinically proven medications approved by FDA.  Willow furthers its deceit by claiming that its drugs are compounded into a "personalized formulation" tailored to a patient's individual needs when in reality Willow sells a standardized, undifferentiated product to all consumers.

---

[4]   Willow, *Home Page*, https://www.startwillow.com/ (last visited Sept. 25, 2025).

[5]   Willow, *Tirzepatide Product Page*, https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025).

[6]   Willow, *Home Page*, https://www.startwillow.com/ (last visited Sept. 25, 2025).

11.    Upon information and belief, every Willow customer receives the same medicine, without any alleged "clinical personalization."  For instance, Willow's intake "quiz,"—purportedly designed to "[f]ind out if Willow is right for you"—concludes that Willow's drugs are appropriate for every potential customer, regardless of the information provided in response to the quiz prompts and regardless of the customer's weight. Willow's claims that its Tirzepatide Treatment (or any medicines) is personalized, *i.e.*, compounded and tailored specifically to the individual, are therefore literally false.

12.    Notably, FDA has taken issue with the very types of claims that Willow is making—*i.e.,* claims regarding the safety and effectiveness of compounded products and the allegedly personalized nature of these drugs.  On September 16, 2025, FDA publicly posted dozens of warning letters sent to retailers of compounded drugs; these letters repeatedly identify as "false and misleading" numerous advertisements containing mirror-image statements to Willow's claims.  The advertisements referenced in these warning letters included statements promoting compounded drugs as containing "clinically proven"[7] or "doctor trusted"[8] ingredients; being "clinically proven"[9] or "clinically

---

[7]  FDA, *Warning Letter to Hims & Hers, inc. dba Hims*, (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hims-hers-health-inc-dba-hims-09092025.

[8]  FDA, *Warning Letter* to *Bioverse, Inc. dba Bioverse* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/bioverse-inc-dba-bioverse-09092025.

[9]  FDA, *Warning Letter to TRYM Health, Inc. dba TRYM Health* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/trym-health-inc-dba-trym-health-09092025; FDA, *Warning Letter to Healthy Male* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthy-male-09092025; FDA, *Warning Letter to EvoLife Wellness* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/evolife-wellness-715507-09092025; FDA, *Warning Letter to Curex* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/curex-09092025; FDA, *Warning Letter to Healthon Inc. dba Healthon* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthon-inc-dba-healthon-09092025; FDA, *Warning Letter to Slendid* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/slendid-09092025; FDA, *Warning Letter to The HCG Institute* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hcg-institute-09092025; FDA, *Warning Letter to Lyfe Rx* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/lyfe-rx-09092025.

shown"[10]; being "recognized for effective weight loss"[11]; "backed by extensive clinical research"[12]; working by "mimic[ing] a naturally occurring hormone in the body"[13]; and being "customized";[14] "personalized";[15] or "custom" products.[16]  Willow's false and misleading claims—for example, that its Tirzepatide Treatment undergoes "extensive testing," is a "premium, personalized blend," and that Willow offers "personalize[d] trusted, clinically proven medications" —are indistinguishable.

13.    Willow's advertising makes egregious misrepresentations to a targeted and vulnerable audience seeking to improve their health through weight loss programs. Willow's conduct directly compares its drugs to Lilly's safe and effective FDA-approved medicines—using false claims of scientific validity and superiority—and results in potential patients being lured away from Lilly's safe and effective FDA-approved medicines under false pretenses, causing Lilly competitive injury. Willow's brazen use of powerful terms such as "extensive testing" or "science" backed medication that is "better"

---

[10]  FDA, *Warning Letter to Healthy Male* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthy-male-09092025.

[11]  FDA, *Warning Letter to Bioverse, Inc. dba Bioverse* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/bioverse-inc-dba-bioverse-09092025.

[12]  FDA, *Warning Letter to Sprout Health Partners LLC dba Sprout Health* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/sprout-health-partners-llc-dba-sprout-health-09092025.

[13]  FDA, *Warning Letter* to *Lumimeds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/lumimeds-09092025.

[14]  FDA, *Warning Letter to Fancy Meds, LLC dba Fancy Meds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/fancy-meds-llc-dba-fancy-meds-09092025; FDA, *Warning Letter to directmeds.com, Inc. dba DirectMeds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/directmedscom-inc-dba-directmeds-09092025.

[15]  FDA, *Warning Letter to Elevate Your Wellness LLC, dba Elevated* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/elevate-your-wellness-llc-dba-elevated-09092025.

[16]  FDA, *Warning Letter to MedClub by Dr. Jenn* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/medclub-dr-jenn-09092025.

or a "premium" product over Lilly's tirzepatide-based medicines—without having any of the very testing Willow claims to have—is deceptive and illegal.[17]  To stop Willow's deception, Lilly brings this action pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

## THE PARTIES

14.    Plaintiff Lilly is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

15.    Defendant Willow is a Delaware corporation with a principal place of business at 1401 Lavaca Street PMB 41529, Austin, TX 78701.

## JURISDICTION AND VENUE

16.    The Court has subject matter jurisdiction over the Lanham Act cause of action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331.  Additionally, and, in the alternative, this Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $75,000.

17.    Willow operates and conducts business in California by promoting and selling the tirzepatide products at issue in this Complaint to California residents.  Willow requires that patients must be located in "Arizona, California, Florida, Massachusetts, Texas or Pennsylvania in order to use the Services."[18]    Willow's website, "https://www.startwillow.com," also offers users the ability to select "California" as a resident state.[19]

18.    Willow has availed itself of the protections of this state, including by specifying in its terms and conditions for consumers using Willow's services[20] that "[t]hese

---

[17]  Willow, *Tirzepatide Product Page*, https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025).

[18]  Willow, *Terms and Conditions*, https://www.startwillow.com/terms-and-conditions (last visited Sept. 25, 2025).

[19]  Willow, *What state do you live in*, https://app.startwillow.com/account/state (last visited Sept. 25, 2025).

[20]  To be clear, these terms and conditions do not govern Willow's relationship with Lilly, but rather illustrate another way in which Willow subjects itself to jurisdiction here.

Terms and any action related thereto will be ***governed by the laws of the state of California*** . . . . All claims, legal proceedings, or litigation arising in connection with the Services will be brought solely in the ***federal or state courts located in Los Angeles County, California***, United States, and you consent to the jurisdiction of and venue in such courts and waive any objection as to inconvenient forum."[21]

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Lilly's claim occurred in this District. Willow operates and conducts business in California, including by engaging in its unlawful promotion and deceptive sale of tirzepatide products at issue pursuant to several California professional licenses, including but not limited to a physician's license from the Medical Board of California,[22] and by facilitating the purchase and shipping of the at-issue products to California consumers.

## FACT ALLEGATIONS

### I.    LILLY'S TIRZEPATIDE INJECTABLE MEDICINES

#### A.    Lilly's Long History of Developing and Manufacturing Safe and Effective Medicines

20.    Lilly is an international medicine company and pharmaceutical manufacturer. Throughout its nearly 150-year existence, Lilly has pioneered countless life-changing discoveries. Today, Lilly's medicines help tens of millions of patients across the globe.

21.    Lilly manufactures its medicines under strict controls in state-of-the-art facilities, which employ thousands of highly specialized personnel to ensure that Lilly's medicines meet its rigorous quality and safety standards. Transforming active pharmaceutical ingredients, or API, into medicine is a complex, methodical, and science-based process. Lilly follows Current Good Manufacturing Practices ("cGMP") across the

---

[21] Willow, *Terms and Conditions*, https://www.startwillow.com/terms-and-conditions (last visited Sept. 25, 2025) (emphasis added).

[22] California Dep't of Consumer Affairs, Med. Bd. of California, Licensing Details For: G 80363, https://search.dca.ca.gov/details/8002/G/80363/776481d955b21443f619936cb247cab0 (last visited Sept. 25, 2025).

design, monitoring, and control of manufacturing processes and facilities—from establishing robust quality management systems to obtaining quality raw materials and detecting and investigating product quality deviations. Each step—from chemical synthesis of the API to formulation, device assembly, and packaging—requires extensive testing and controls and specialized equipment.

22.   Lilly develops and manufactures its medicines in compliance with FDA oversight, the international gold standard for pharmaceuticals. It includes rigorous pre-approval testing for safety and effectiveness under specific conditions for use, routine FDA inspections of manufacturing facilities, adverse event reporting obligations, and post-market surveillance and studies. Additionally, Lilly's medicines must be, and always are, accompanied by important labels, instructions, and warnings, which themselves are approved by FDA.

**B.    The Clinical Trial Process Necessary to Safely Bring Medicines to Market**

23.   Before a new prescription medication can be brought to market, it must be clinically tested through a rigorous series of studies designed to determine whether the medication is safe and effective for people to use and to receive FDA approval.

24.   FDA approval is famously hard to earn. More than 90% of drug candidates ultimately fail.[23] It is also an enormously costly and time-intensive process. "On average, it takes 10-15 years and costs $2.6 billion to develop one new medicine."[24]

25.   To begin, drug sponsors first subject the drug candidate to preclinical testing to determine if the product is reasonably safe for initial use in humans and if the drug candidate exhibits pharmacological activity that justifies commercial development. Based on the data derived from preclinical testing, the drug sponsor must apply for an "Investigational New Drug" (IND) designation from FDA before the drug candidate can

---

[23]   Biotechnology Innovation Organization, *Clinical Development Success Rates and Contributing Factors 2011-2020* at 3 (Feb. 2021), (hereinafter "BIO 2021").

[24]   PHRMA, *Research and Development Policy Framework* (Sept. 2024), https://tinyurl.com/5eecdtm9.

move into the clinical trial stage, in which it is tested in human subjects through a series of increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials. The IND application requires disclosure of information pertaining to "the composition, manufacturer, stability, and controls used for manufacturing" the API contained in the drug candidate.[25] Once FDA grants the IND application, the clinical trial stage can begin using the same API disclosed in the IND application.

26.    Phase I clinical trials typically evaluate the drug candidate's safety and generate data that will inform a range of doses that are safe for use in further clinical testing. This determination typically culls a large portion of drug candidates—for example, averaging across diseases, only 52% of drug candidates that make it through Phase I testing will progress to Phase II.[26]

27.    Phase II trials are typically designed to preliminarily establish the effectiveness in addition to further confirming safety of the drug for a particular indication over a range of doses and to develop additional data on its safety. Another swath of drug candidates is eliminated in Phase II; drug candidates for various diseases that make it through Phase II only progress to Phase III at rates between 15% and 48.1% depending on disease type.[27] Phase III trials are designed to confirm the safety and effectiveness of a dose identified in Phase II trials in a much larger patient population as well as to monitor side effects.

28.    Based on the data assembled during development in Phase I, Phase II, and Phase III clinical trials, a sponsor company can then submit a marketing application to FDA called a New Drug Application (NDA), where the sponsor requests that FDA approve the drug candidate for sale and marketing in the United States. As part of this application,

---

[25] FDA, *Investigational New Drug (IND) Application (Sept. 16, 2025)*, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

[26] BIO 2021 at 7.

[27] *Id.*

the sponsor must provide a "composition statement" detailing the "full list of the articles used as components of such drug" and a "full statement of the composition of such drug."[28]

29.    There is a scientific reason for the specificity of the information FDA requires in approval of a medicine.  Drugs purporting to contain the same active ingredient can have different effects based on differences in API formulation or production, method of administration, dosage form, and manufacturing specifications.  Moreover, because the ingredients in a drug can interact with one another, drugs with even the same API, but different additives or ingredients, may differ significantly in their safety and effectiveness profile.  For this reason, the FDCA requires that generic drug applications show both (1) that it uses the same API as a previously approved product but independently (2) that there is sufficient evidence to conclude the generic is "bioequivalent" to the listed drug.  *See* 21 U.S.C. § 355(j)(2)(A)(ii), (iv). An applicant therefore has to show via valid evidence that their generic drug will function the same in the human body as the listed drug; they cannot rely solely on the fact that it uses the same API as a previously approved product.

30.    To ensure that the drug candidate being sold to the public contains the same specifications as the drug that was clinically tested, FDA conducts inspections to monitor compliance with cGMP and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications even after granting the NDA.  FDA also requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies.  All of this is to ensure that— in FDA's words—"American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."[29]

---

[28] FDA, *Content and Format of Composition Statement and Corresponding Statement of Ingredients in Labeling in NDAs and ANDAs* (Apr. 2024), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/content-and-format-composition-statement-and-corresponding-statement-ingredients-labeling-ndas-and

[29] FDA, *Development & Approval Process* (Aug. 8, 2022), https://www.fda.gov/drugs/development-approval-process-drugs.

### C.    MOUNJARO® and ZEPBOUND®

31.    FDA-approved MOUNJARO® and ZEPBOUND® pursuant to Lilly's new drug applications, which were the culmination of the lengthy and expensive clinical trial process described above that is designed to develop, study, and bring safe medicines to patients.

32.    MOUNJARO® and ZEPBOUND® were approved after nearly a decade of development and have undergone testing in 37 completed clinical trials, with more ongoing.    They are groundbreaking medicines containing a macromolecule Lilly discovered called tirzepatide.  As formulated by Lilly, these tirzepatide medicines target patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors.  These medicines activate both receptors to improve blood sugar control and reduce appetite and food intake.

33.    Both medicines meet critical patient needs.  MOUNJARO® is FDA-approved to treat type-2 diabetes, and ZEPBOUND® is approved to treat chronic weight management and obstructive sleep apnea in certain adults.  Today, Lilly manufactures, markets, and sells MOUNJARO® and ZEPBOUND® throughout the United States, among other places.

34.    Lilly is the only lawful source of mass-produced tirzepatide in the United States.  Because tirzepatide is a new active ingredient not previously approved by FDA, Lilly earned new chemical exclusivity for tirzepatide.  As a result, through at least May 13, 2027, FDA cannot accept an application from any other person for any other tirzepatide product.

35.    MOUNJARO® and ZEPBOUND® are the only FDA-approved medicines containing tirzepatide in the United States.  Lilly's tirzepatide medicines are injectables; they are administered via under-the-skin injections.  FDA has not approved, and Lilly does not sell, any tirzepatide product in oral form.

## II.    DRUG COMPOUNDING

### A.    Compounded Drugs Are Neither Clinically Tested Nor FDA-Approved

36.     Compounded drugs live at the other end of the regulatory spectrum: they are not FDA-approved, do not undergo clinical trials, are not made pursuant to cGMP, and are not subject to pharmacovigilance requirements like adverse event reporting.  Indeed, FDA generally does not even know what compounded drugs are produced or sold in the United States, where they are made, or by whom.[30]

37.     Drug compounding is a "practice in which a licensed pharmacist, a licensed physician or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."[31]  For example, if an individual patient is allergic to an ingredient in an FDA-approved medicine, a compounding pharmacy could produce a version of that medication that does not contain the allergen for that individual patient.

38.     As FDA has made clear, "[c]ompounded drugs are not FDA-approved."[32] FDA does not review compounded drugs to evaluate their safety, effectiveness, or quality before they reach patients.

39.     Unlike FDA-approved medications, compounded drugs are also not tested in preclinical studies or in clinical trials.   Further, compounding pharmacies are not subject to CGMP, their facilities are not subject to inspections by regulatory authorities, and they have no reporting requirements for adverse events.

40.     For these and other reasons, FDA has warned that "[c]ompounded drugs . . . do not have the same safety, quality, and effectiveness assurances as approved drugs.

---

[30]  *See, e.g.*, Congressional Research Service, *Drug Compounding: FDA Authority and Possible Issues for Congress* (Jan. 5, 2018) ("[T]he majority of compounding facilities in the United States do not register with FDA ….  This means that FDA often is unaware of potential problems with the drug products or facility conditions unless the agency receives a complaint.").

[31]  FDA,     *Human     Drug     Compounding*     (May     15,     2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

[32]  FDA, *Compounding and the FDA: Questions and Answers* (Sept. 16, 2025), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

Unnecessary use of compounded drugs . . . exposes patients to potentially serious health risks."[33]  FDA further advises that compounded drugs "should only be used to meet a patient's needs if the patient's medical needs cannot be met by an available FDA-approved drug."[34]

41.  The risks FDA has identified with compounded drugs generally are heightened in the context of compound tirzepatide-based drugs because, on information and belief, all tirzepatide used in compounded drugs is produced by foreign manufacturers—generally in China.[35]  These foreign manufacturers are not subject to the same quality controls as US-based tirzepatide manufacturers (like Lilly) and, as a result, produce tirzepatide with little to no oversight.  Thus, the tirzepatide used in compounded tirzepatide drugs may differ significantly from the tirzepatide used by Lilly in its medicines, which is produced in compliance with all applicable federal and state requirements.

42.  Indeed, FDA has identified a "concerning trend about non-compliance with CGMP" from "API suppliers for compounding sites."[36]  "Over the past five years, 72% of API manufacturing sites subject to FDA regulatory actions (e.g., warning letters, import alerts, and regulatory meetings) were sites that exclusively supply compounding pharmacies."[37]  This is notable because the sites "represent only 18% of API manufacturers."[38]

---

[33]  FDA, *Compounding and the FDA:  Questions and Answers* (June 29, 2022), https://web.archive.org/web/20220702213650/https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[34]  FDA, *FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products* (July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

[35]  FDA, *National Drug Code Directory*, https://www.accessdata.fda.gov/scripts/cder/ndc/dsp_searchresult.cfm (current through Sept. 28, 2025).

[36]  U.S. Food & Drug Administration, Report on the State of Pharmaceutical Quality, FY 2024, available at https://www.fda.gov/media/188236/download.

[37]  *Id.*

[38]  *Id.*

43.    On September 5, 2025, FDA went further and expressed "serious concerns with compounded versions of semaglutide and tirzepatide, including dosing errors, use of unapproved salt forms and adverse events—some requiring hospitalization."[39]  According to FDA, these concerns were due in substantial part to the use of "illegal GLP-1 active ingredients imported from overseas" by compounders formulating weight-loss drugs in the United States.[40]  In an effort to prevent these dangerous, foreign-manufactured active ingredients from being used to compound weight-loss drugs, FDA "established a 'green list' import alert to help stop potentially dangerous GLP-1. . .active pharmaceutical ingredients (APIs) from unverified foreign sources from entering the U.S. market."[41]

**B.    Consumers Are Being And Have Been Deceived About Compounded Tirzepatide**

44.    The false and misleading promotion of compounded tirzepatide-based medicines has been prolific, and as a result consumers have been overwhelming deceived as to the safety and effectiveness of these untested, unapproved compounded drugs.

45.    For example, in 2025, the National Consumers League (NCL) conducted a survey of 1,498 women and found widespread confusion as to the nature of compounded GLP-1s.  For example, of the nearly fifteen hundred women surveyed, "71 percent hold the view that compounded GLP-1s must be tested and proven safe to be on the market," and over half believed that compounded GLP-1s are FDA-approved.[42]  The survey also found that 49% of women—and 54% of women with obesity—believe that compounded GLP-1s "have the same ingredients as the branded GLP-1 drugs," despite the fact that

---

[39]  FDA, *FDA Launches Green List to Protect Americans from Illegal Imported GLP-1 Drug Ingredients* (Sept. 5, 2025), https://www.fda.gov/news-events/press-announcements/fda-launches-green-list-protect-americans-illegal-imported-glp-1-drug-ingredients.

[40]  *Id.*

[41]  *Id.*

[42]  Nat'l Consumers League, *The Influence of Disinformation on Attitudes and Beliefs About Compounded GLP-1 Drugs: A Dose of Reality* at 6 (May 2025), https://nclnet.org/wp-content/uploads/2025/05/The-Influence-of-Disinformation-on-Attitudes-and-Beliefs-About-Compounded-GLP-1-Drugs-Survey-Results.pdf.

compounded GLP-1s are often formulated with untested and unapproved additives like glycine.[43]

46.    As the NCL noted, these views on compounded GLP-1s are false.  The NCL observed that "compounded versions [of medications] can be made with different ingredients or at different concentrations, potentially leading to ineffective treatment or adverse events."[44]  In explaining the nature of the deceit, NCL noted "[t]he truth is that compounded GLP-1s are held to lower safety standards than FDA-approved drugs and do not undergo premarket FDA review, a requirement for branded drugs to be on the market."[45]

47.    Those consumer misperceptions are fed and exacerbated by widespread false advertising by companies that promote compounded GLP-1 drugs like Willow.  To that end, the NCL's survey specifically considered the role that advertising plays in these false beliefs.  In particular, NCL used a realistic yet fictional advertisement to assess the impact of "aggressive direct-to-consumer advertising on television, social media, and online about compounded GLP-1 products" on consumers.[46]  Over 80% of respondents found the advertisement credible—leading the NCL to conclude that, "even though women understand the purpose and limitations of compounded drugs generally, the deluge of misleading claims online has clouded their views about GLP-1 compounded products[.]"[47]

48.    Notably, the claims included in the NCL's fictional ad mirror the claims that Willow makes in its own advertising.  For example, "see what the scientists have to say" is nearly identical to Willow's "[t]he science behind Tirzepatide," and "Lose Weight Fast" is similar to—but even less specific than—Willow's "[l]ose 20% of body weight."  As discussed in detail below, the statements that NCL found to be exceedingly deceptive are

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

the very same types of claims Willow uses to deceive patients as to the true nature of its compounded Tirzepatide medicines.

49.     A similar conclusion was reached by a study of compounded GLP-1 advertising conducted by the JAMA Health Forum, which found that most websites advertising such drugs "provided limited safety information and unauthorized efficacy claims."[48]  Based on these findings, the study recommended that FDA "require websites to explicitly disclose and define compounding, including lack of FDA approval; institute unique naming conventions for compounded medications; and be given greater authority to act against misleading compounded medication advertising."[49]

50.     Recently, FDA agreed and called out prolific false and misleading advertising of compounded drugs like those Willow sells.  For instance, on September 16, 2025, FDA publicly posted warning letters sent to various compounders and telehealth companies selling compounded weight-loss drugs, explaining that advertising statements mirroring those made in Willow's advertising are "false or misleading" statements.

---

[48]  JAMA Network, *Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists* (Jan. 17, 2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2829225.

[49]  *Id.*

51.    For example, FDA warned that advertisements promoting compounded weight loss drugs as containing "clinically proven ingredients"[50]; being "clinically proven"[51] or "clinically shown"[52]; being "recognized for effective weight loss"[53]; "delivers the same active ingredient found in the leading GLP-1 weight loss medications – without the need for injections,"[54] and "backed by extensive clinical research"[55] were all false and misleading because they imply that the compounded drug products "are the same as an FDA-approved product when they are not."[56]

---

[50] FDA, *Warning Letter to Hims & Hers, Inc. dba Hims* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hims-hers-health-inc-dba-hims-09092025.

[51] FDA, *Warning Letter to TRYM Health, Inc. dba TRYM Health* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/trym-health-inc-dba-trym-health-09092025; FDA, *Warning Letter to Healthy Male* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthy-male-09092025; FDA, *Warning Letter to EvoLife Wellness* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/evolife-wellness-715507-09092025; FDA, *Warning Letter to Curex* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/curex-09092025; FDA, *Warning Letter to Healthon Inc. dba Healthon* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthon-inc-dba-healthon-09092025; FDA, *Warning Letter to Slendid* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/slendid-09092025; FDA, *Warning Letter to The HCG Institute* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hcg-institute-09092025; FDA, *Warning Letter to Lyfe Rx* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/lyfe-rx-09092025.

[52] FDA, *Warning Letter to Healthy Male* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthy-male-09092025.

[53] FDA, *Warning Letter to Bioverse, Inc. dba Bioverse* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/bioverse-inc-dba-bioverse-09092025.

[54] FDA, *Warning Letter to Elevate Your Wellness LLC, dba Elevated* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/elevate-your-wellness-llc-dba-elevated-09092025.

[55] FDA, *Warning Letter to Sprout Health Partners LLC dba Sprout Health* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/sprout-health-partners-llc-dba-sprout-health-09092025.

[56] *Supra* notes 50–55.

52.     Moreover, FDA warned that advertisements promoting compounded weight loss drugs as being "customized";[57] "personalized";[58] or "custom" products;[59] were false and misleading because they imply that the compounded drug products "are the same as an FDA-approved product when they are not."[60]

53.     The categories of claims that FDA has found are false and misleading are the very same types of claims that Willow has put into the market.  Indeed, there is no material difference between Willow's claims that its Tirzepatide Treatment has undergone "extensive testing" and the "clinically proven" and "clinically shown" statements that FDA determined was false and misleading.  The same is true for Willow's claims that its medicine is "personalized," which is identical to statements flagged by FDA as false and misleading.

## III.    WILLOW'S FALSE AND MISLEADING CLAIMS

54.     Willow is a telehealth platform that purports to "specialize in providing expert care for weight loss" and offer "individualized, specialized treatments."[61]

55.     Willow's website, located at https://www.startwillow.com/, encourages consumers to start their "weight loss journey" with Willow, expressly telling consumers that it offers "***proven medicine***" that powers weight loss to its patients:

---

[57]  FDA, *Warning Letter to Fancy Meds, LLC dba Fancy Meds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/fancy-meds-llc-dba-fancy-meds-09092025; FDA, *Warning Letter to directmeds.com, Inc. dba DirectMeds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/directmedscom-inc-dba-directmeds-09092025.

[58]  FDA, *Warning Letter to Elevate Your Wellness, dba Elevated* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/elevate-your-wellness-llc-dba-elevated-09092025.

[59]  FDA, *MedClub by Dr. Jenn* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/medclub-dr-jenn-09092025.

[60]  *Supra* notes 57–59.

[61]  Willow, *About Page*, https://www.startwillow.com/about (last visited Sept. 25, 2025).



56.    Willow goes on to note that it offers three different weight loss drugs: "oral treatment" named Semaglutide Tablets, "standard treatment" named Semaglutide, and "*premium treatment*" named Tirzepatide "for even better results"[62]:



57.    On its homepage, Willow expressly tells consumers that it offers "smarter medicine, made for you" further explaining that it uses "precision medicine to *personalize trusted, clinically proven medications*"[63]:



58.    Willow also promotes its individual drugs, including its injectable Tirzepatide Treatment and oral Tirzepatide Drops, throughout its false advertising.  Specifically, in

---

[62]  Willow, *Home Page*, https://www.startwillow.com/ (last visited Sept. 25, 2025) (emphasis added).

[63]  *Id.*

promoting its compounded tirzepatide drugs, Willow has made, and continues to make, numerous false and misleading statements throughout its advertising pertaining to the inherent nature and quality of its compounded tirzepatide drugs.  These include falsely telling consumers that (A) Willow's Tirzepatide Treatment has undergone "extensive testing" and is backed by "science," and thus has clinical results proving it is safe and effective for weight loss, (B) Willow's Tirzepatide Treatment is superior to other tirzepatide-based medications, including Lilly's medicines, (C) Willow's Tirzepatide Drops are a safe, effective, and superior alternative to injectable tirzepatide medications, like Lilly's medicines, and (D) the medicine prescribed for Willow's Tirzepatide Treatment is clinically tailored and compounded specifically for each individual patient.[64]  None of these are true.  These false and misleading statements—each category of which directly refers to or claims superiority over Lilly's FDA-approved medicines—go to the inherent nature of Willow's drugs and deceive consumers as to the nature and quality of Willow's unapproved and untested drugs.

59.    A compilation of representative examples of Willow's false and misleading advertising is discussed below and attached hereto as **Exhibits A and B**.

### A.    Willow's Advertising Expressly and Impliedly Communicates That Willow's Tirzepatide Treatment Has Been Clinically Tested

60.    Throughout its advertising, Willow expressly and impliedly communicates to consumers that its Tirzepatide Treatment is a clinically tested weight loss treatment.  In particular, Willow makes false, express and implied establishments claims, explicitly telling consumers that it has testing and science to back the very medicine that consumers will get from Willow when, in fact, the testing that Willow advertises it has does not actually exist.

61.    An establishment claim is a statement, either express or implied, that the advertiser has performed scientific tests or studies to prove a product's effectiveness or

---

[64]  Willow, *Tirzepatide Product Page*, https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025).

some other particular attribute. *See, e.g., Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002) (an establishment claim is "an advertisement [that] cites [to] testing"). Establishment claims can be either "explicit[] or implicit[]." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992); *BASF Corp., v. Old World Trading Co.*, 41 F.3d 1081, 1090 (7th Cir.1994) (discussing explicit and implicit establishment claims); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (recognizing the two types of establishment claims within the 9th Circuit).

62. When an advertiser makes an establishment claim, it must actually have the scientific testing referenced or alluded to in its advertising. As a result, to prove the literal falsity of an establishment claim, "the plaintiff must prove only that the tests did not establish the proposition for which they were cited." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1309 (11th Cir. 2010); *see also Southland Sod Farms*, 108 F.3d at 1139. An advertising claim purporting to be supported by testing "is per se false without additional evidence from the plaintiff," if the advertiser does not have such tests. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590 (3d Cir. 2002); *Monster Energy Co. v. Vital Pharms., Inc.*, 2022 WL 1599712, at *18 (C.D. Cal. Apr. 19, 2022) (citing *Novartis*, 290 F.3d at 590) (noting that a lack of testing supports a finding of literally falsity).

63. Circuit courts across the country, including the Ninth Circuit, uniformly recognize the validity of false establishment claims, and hold that a plaintiff satisfies its evidentiary burden of proof at trial under the Lanham Act by showing that the advertiser does not have the tests it claims to have. *See Osmose,* 612 F.3d at 1309 (collecting cases); *Castrol,* 977 F.2d at 63 (where "defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited."); *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare L.P.*, 131 F.3d 430, 435 (4th Cir. 1997) ("When an advertising claim of favorable fact either expressly or impliedly asserts that the fact is [test

or] study-validated, the fact of the validation becomes an integral and critical part of the claim. Such a claim may therefore be proven literally false by showing only that the test asserted to validate it did not in fact do so."); *Rhone–Poulenc Rorer Pharms. Inc. v. Marion Merrell Dow, Inc.,* 93 F.3d 511, 514–15 (8th Cir. 1996) (similar); *Novartis Consumer Health,* 290 F.3d at 586–87 (similar); *BASF Corp.,* 41 F.3d at 1091 (similar); *Clorox Co. Puerto Rico v. Procter & Gamble Com. Co.*, 228 F.3d 24, 35 (1st Cir. 2000) (similar); *Southland Sod Farms,*108 F.3d at 1139 (adopting this standard within the 9th Circuit).

64. Here, as discussed in detail below, Willow's advertising expressly and impliedly communicates to consumers that Willow's Tirzepatide Treatment has been tested and proven safe and effective for weight loss.

65. Specifically, at the very top of its webpage for its Tirzepatide Treatment, Willow boldly and explicitly touts that its "medication undergoes *extensive testing*."[65]



---

[65] Willow, *Tirzepatide Product Page,* https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025). Notably, when Lilly filed this suit, Willow advertised that its Tirzepatide Treatment undergoes "extensive quality checks." Since this suit was filed, Willow revised its claim to be more aggressive—and more deceitful—in broadly telling consumers that its premium, injectable medicine is "extensively tested."

66. This statement expressly tells potential patients that Willow has extensive testing on its medication, and as shown above, this express reference to "extensive testing" is made in direct connection with Willow's claims that its Tirzepatide Treatment offers superior results to other tirzepatide medicines. Thus, the only message necessarily communicated by Willow's advertising is that it has extensive testing on the effectiveness of its alleged premium weight loss medication.

67. This false message is reinforced throughout Willow's advertising, both expressly and implicitly.

68. In particular, Willow repeatedly uses the term "clinical" in discussing its Tirzepatide Treatment. For example, Willow describes its Tirzepatide Treatment as being designed "for those whose health profile or goals require clinical personalization." Similarly, in describing the difference between Semaglutide (Willow's "standard treatment") and Tirzepatide (Willow's advertised "premium treatment"), Willow once again explicitly touts clinical trials, stating "[c]linical trials suggest that tirzepatide offers superior efficacy in both glucose lowering and weight reduction compared to semaglutide."[66] These express references to the "clinical" nature of its medicine, and in particular its Tirzepatide Treatment, further communicates the false message that it has, in fact, been clinically tested.

69. Willow also boasts that consumers will "[l]ose 20% of body weight":



---

[66] *Id.*

By expressly quantifying the expected outcomes, Willow falsely and necessarily implies that it has scientific tests that prove patients will achieve the advertised results.

70.    Immediately following its quantified claim of expected outcomes, Willow then boasts of "the science behind **Tirzepatide**" *i.e.,* the science behind Willow's medicine:[67]

> ### The science behind
> # Tirzepatide
>
> When you eat, the food stimulates your gut to release the GLP-1 hormone. GLP-1 helps lower blood glucose (blood sugar) by triggering insulin release. Insulin helps blood glucose enter your body's cells for later energy use.
>
> In some people, the gut doesn't make enough natural GLP-1, or the brain isn't sensitive to it.
>
> Tirzepatide is a synthetic GLP-1 RA (receptor agonist). A drug that works as an agonist activates the same cell receptors as the body's natural hormones. Semaglutide works in the gut like the body's natural GLP-1, slowing digestion, curbing hunger, and signaling fullness to the brain.

71.    Again, by quantifying the outcomes and expressly referencing the "science" behind Willow's Tirzepatide Treatment, Willow is necessarily communicating to consumers that its Tirzepatide Treatment has been clinically tested and proven to provide the advertised weight loss.

72.    To further reinforce the false narrative that its Treatment is widely tested and proven effective, Willow touts that it offers "game changing weight loss medicine" and then includes quotes from several notable and well-respected scientific journals, necessarily implying that these journals have evaluated and found Willow's Tirzepatide Treatment to be "highly effective" and a "new era in treating obesity":[68]

---

[67]    *Id.* Willow's social media advertising contains similar statements, for instance boasting that it offers "science-backed treatments for real life results" and that its drugs are "supported by science." *See* Exhibit A.

[68]    *Id.*

73.     Willow's quotation of discussions in notable science journals about the results of testing conducted on GLP-1 medication, made in the context of its statements regarding "extensive testing" and repeated references to the "clinical" nature of its medicines, reinforces the false message that Willow's Tirzepatide Treatment was the subject of such clinical testing.  This is particularly true given that Willow's Tirzepatide Treatment is confusingly branded as "Tirzepatide," which makes it impossible for a consumer to distinguish between testing conducted on a branded product containing tirzepatide, like Lilly's medicines, or Willow's Tirzepatide Treatment.

74.     Indeed, the studies, clinical outcomes and articles that Willow repeatedly references throughout its advertising are actually studies, outcomes and articles concerning Lilly's FDA-approved, clinically tested MOUNJARO® and ZEPBOUND® medicines.  Willow's attempt to bolster its untested, unproven product based on Lilly's investments and reputation is exceedingly deceitful.  *See, e.g., Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC,* 165 F. Supp. 3d 937, 951 (S.D. Cal. 2016) (allegations regarding advertising statements communicating that inferior product was "clinically proven to help reduce body fat and weight" by citing studies of competitor product without justification sufficient to establish falsity).

75.     Notably, Willow cannot rely on Lilly's clinical trials for its FDA-approved tirzepatide medicines to support these claims, because Willow does not sell Lilly's MOUNJARO® or ZEPBOUND® medicines, which were the actual medicines tested in Lilly's clinical trials.  Nor does Willow use Lilly-manufactured tirzepatide—the active pharmaceutical ingredient that was the subject of Lilly's clinical testing—in its drugs.  For the reasons previously discussed (*supra* Section II(B)), differences in manufacturing

controls and procedures can lead to substantial differences in the potency and quality of a pharmaceutical ingredient.  Thus, Lilly's clinical studies cannot support the safety and effectiveness of Willow's Tirzepatide Treatment.

76.    Moreover, Willow's advertising explicitly refers to its "medical team of board certified doctors" and goes so far as to include multiple images of a doctor in scrubs[69]:

 

77.    As the FTC has noted in its 2022 Health Products Compliance Guide, when "images of doctors in white lab coats" are used in an ad for weight loss products, those images "give an impression of scientific legitimacy and likely convey an implied claim that the product has been clinically proven to be effective for weight loss." *See* FTC Health Products Compliance Guides ("Identifying Express and Implied Claims," Example 1).[70]

78.    Here, Willow's use of images of a doctor wearing scrubs while touting the proven outcomes and "clinical" nature of its Tirzepatide Treatment necessarily imply that it is scientifically and clinically proven safe and effective.

79.    In short, Willow's advertising is carefully calculated to convey a singular, consistent, and deceptive message to consumers:  Willow's Tirzepatide Therapy has been clinically tested and scientifically validated and results in safe and effective weight loss. Anchored on an express statement that Willow's Tirzepatide Treatment has undergone "extensive testing," Willow's references to "the science behind Tirzepatide," the expected

---

[69]  Willow, *Tirzepatide Product Page,* https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025).

[70]  Federal Trade Commission, *Health Products Compliance Guide* (Dec. 2022), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ftc.gov/system/files/ftc_gov/pdf/Health-Products-Compliance-Guidance.pdf at 5.

outcome of 20% weight loss, and images of doctors to falsely bolster the scientific legitimacy of its Tirzepatide Treatment expressly and necessarily communicate that Willow's Tirzepatide Treatment has been clinically tested and proven to function in the way Willow claims and with the results Willow promises.

80.    As a result of its promise to consumers that it has "extensive testing" on the effectiveness of its Tirzepatide Treatment, and that its Tirzepatide Treatment has been clinically tested, scientifically studied, and has both proven results and a safety and effectiveness profile, Willow is required to have such testing.  If it has no such testing, its claim is per se false.  *Novartis,* 290 F.3d at 590; *Monster Energy,* 2022 WL 1599712, at *18.

81.    In fact, Willow does not have any clinical testing assessing the scientific mechanism, function, safety, or effectiveness of its Tirzepatide Treatment—a fact that Willow has expressly acknowledged. Without the very testing it advertises that it has, Willow's advertising is false, and Lilly need not prove anything further.  *Novartis,* 290 F.3d at 590; *Monster Energy,* 2022 WL 1599712, at *18.

82.    At base, Willow's establishment claims—*i.e.*, those claims that expressly and impliedly refer to extensive testing and science in the context of weight loss—are literally false because no such testing exists.  As a result, consumers who view Willow's advertising will be deceived into believing that Willow's Tirzepatide Treatment has been proven safe and effective through clinical testing when it has not.  *Mut. Pharm. Co. v. Ivax Pharms., Inc.*, 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006) ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception") (quotations omitted).  This deception is material in that it is "likely to influence the purchasing decision of consumers" because it falsely describes inherent qualities or characteristics of drug products—namely, their safety and effectiveness.  *E.g.*, *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019).

83.    As discussed in detail below, Willow's false establishment claims have proximately caused injury to Lilly.  Willow and Lilly are direct competitors in the market

for tirzepatide drug products. Lilly has invested millions of dollars on clinical testing of its products to ensure they are safe to use and effective for achieving certain therapeutic results. Willow has never performed a clinical test on its Tirzepatide Treatment. Yet Willow's express clinical testing claims falsely and unfairly place Willow's Tirzepatide Treatment on the same playing field as Lilly's FDA-approved and clinically tested medicines by communicating to consumers that Willow's Tirzepatide Treatment is as safe and effective as Lilly's medicines and that its safety and effectiveness have been proven by clinical studies of Willow's Tirzepatide Treatment. It is not; and given that Lilly and Willow sell to the same market at comparable price points, Willow's false advertising has caused a diversion of sales and lost profits from Lilly on those sales. It has also caused, and continues to cause, harm to Lilly's goodwill, reputation, and standing with the consuming public, and exposes the public to the unnecessary risks associated with untested and unproven drugs.

**B.      Willow's Advertising Necessarily Communicates That Willow's Tirzepatide Treatment Offers Superior Outcomes Over Lilly's Tirzepatide Medicines.**

84.     Not content to simply (yet falsely) tout the alleged clinical testing of its own Tirzepatide Treatment, Willow goes further and tells consumers that its Tirzepatide Treatment offers *superior outcomes* for its patients.

85.     In fact, Willow touts that its Tirzepatide Treatment is a "premium treatment" and that its "premium, personalized blend" offers "better results" than other tirzepatide products, and this express statement of superior outcomes is immediately followed by a reference to "extensive testing":[71]

---

[71] Willow, *Tirzepatide Product Page*, https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025).

86.    Willow's explicit reference to "better results" is, on its own, false and misleading.    Willow's Tirzepatide Treatment does not offer "better results" (either generally or specifically to weight loss) than Lilly's MOUNJARO® or ZEPBOUND®—the only clinically tested and FDA-approved tirzepatide products on the market.

87.    Of course, this express statement of superior outcomes is immediately followed by a reference to "extensive testing."    As a result, Willow's advertising necessarily communicates to consumers that Willow's Tirzepatide Treatment has been subjected to testing against other tirzepatide-based medications, including Lilly's medicines, that prove that Tirzepatide Treatment provides better results.

88.    Again, Willow must produce the very testing its advertising says it has.    Yet, once again, Willow has no testing of its own product—and what testing it refers to is of FDA-approved medicines, which cannot be the basis of showing the purported superiority of Willow's different product.

89.    Willow's superiority claims—*i.e.*, those claims that expressly and impliedly communicate that Willow's Tirzepatide Treatment is a premium option that provides better results than other tirzepatide-based medications, including Lilly's medicines—are literally false.    As a result, consumers who view Willow's advertising will be deceived into believing that Willow's Tirzepatide Treatment is superior to other tirzepatide-based medicines, like Lilly's medicines, when it is not.    *Mut. Pharm.*, 459 F. Supp. 2d at 933 ("Where the advertisement is literally false, a violation may be established without

evidence of consumer deception") (quotations omitted). This deception is material in that it is "likely to influence the purchasing decision of consumers" because it falsely describes inherent qualities or characteristics of drug products—namely, their effectiveness. *E.g.*, *Clorox,* 398 F. Supp. 3d at 644.

90.     Finally, as discussed in more detail below, Willow's superiority claims have proximately caused injury to Lilly. Willow and Lilly are direct competitors in the market for tirzepatide drug products. Willow's advertising communicates the clear and false message that Willow's Tirzepatide Treatment provides better results than other tirzepatide-based medications, including Lilly's medicines. By falsely comparing its Tirzepatide Treatment to Lilly's FDA-approved and clinically tested medicines and communicating that Tirzepatide Treatment provides superior results, Willow's false advertising has caused a diversion of sales and lost profits from Lilly on those sales. It has also caused, and continues to cause, harm to Lilly's goodwill, reputation, and standing with the consuming public. And it exposes the public to the unnecessary risks associated with untested and unproven drugs.

### C.     Willow's False and Misleading Claims Regarding Its Tirzepatide Drops

91.     For months, Willow also offered its Tirzepatide Drops, touting that product as a safe and effective alternative to injectable medications. As noted above, after Lilly filed this suit, Willow removed its Tirzepatide Drops from its "treatment" page, yet this product offering is still visible to consumers when they search for "tirzepatide drops" and, upon information and belief, can still be purchased via Willow's website.

92.     Willow's webpage promoting its Tirzepatide Drops is attached hereto as **Exhibit B.**

93.     As evident from the Tirzepatide Drops page at Exhibit B, Willow falsely and deceptively markets and sells Tirzepatide Drops as "a needle-free alternative to injections, offering powerful weight loss benefits in an easy-to-use, once-daily sublingual form." Willow even states that Tirzepatide Drops provide "even ***more*** effective weight loss treatment without injections," once again necessarily communicating to patients that it has

testing that proves its Tirzepatide Drops are safe and effective at weight loss, and that they are somehow **better** than Lilly's FDA-approved medicines.[72]    No clinical study demonstrates that any oral formulation of tirzepatide is safe and effective for human use, much less superior to Lilly's FDA-approved tirzepatide medicines.    Willow is experimenting on consumers with an untested and unapproved product.

94.    In particular, and for example, Willow asserts Tirzepatide Drops "works" because it dissolves and "is absorbed directly into the bloodstream" and describes this treatment as a "safe and popular alternative."[73]

95.    Like its advertising for Tirzepatide Treatment, Willow expressly references the "science behind Tirzepatide Drops" and repeatedly and expressly refers to "clinical trials" to necessarily imply that its Tirzepatide Drops have been clinically proven safe and effective.[74]

96.    Willow goes even further, stating in its advertising that its Tirzepatide Drops are an "***even more effective*** weight loss treatment without injections."[75]  In other words, Willow is not only claiming to provide a clinically tested treatment that has proven safe and effective results, but also one that offers *superior* outcomes to ZEPBOUND®, which FDA has approved to treat obesity.  Of course, no clinical studies support this comparative claim either, which again renders it a literally false establishment claim.

97.    Notably, there are important differences between oral administration and subcutaneous administrations.  As a result of the different ways injectable and oral medications interact with the human body, the rate of absorption and bioavailability of those drugs (especially over time) necessarily varies.  This often causes the API to behave

---

[72] Willow, *Tirzepatide Drops Product Page*, https://www.startwillow.com/tirzepatide-drops (last visited Sept. 25, 2025).

[73] *Id*.

[74] *Id*.

[75] *Id*.

differently once it enters the body, which can "influence drug effectiveness and safety" as well as "the onset, intensity, and sometimes the duration of action."[76]

98.    Without any testing of Willow's oral formulation purporting to administer tirzepatide, or any bioavailability analysis of those products, Willow's claim that clinical trials prove the results of its products, that they have scientific studies behind them, or that they exceed the effectiveness of injectable tirzepatide products are all literally false establishment claims.  Nor does Willow use Lilly-manufactured tirzepatide—the active pharmaceutical ingredient that was the subject of Lilly's clinical testing—in its drugs.  For the reasons previously discussed (*supra* Section II(B)), differences in manufacturing controls and procedures can lead to substantial differences in the potency and quality of a pharmaceutical ingredient.  Thus, once again, Willow cannot rely on Lilly's clinical testing because Lilly's studies have no relevance to an oral drop.

99.    Willow's claims about its Tirzepatide Drops—*i.e.*, those claims that expressly and impliedly communicate that Willow's Tirzepatide Drops are both clinically tested and superior to other tirzepatide-based medications, including Lilly's medicines—are literally false.  As a result, consumers who view Willow's advertising will be deceived into believing that Willow's Tirzepatide Drops have been clinically tested and are superior to other tirzepatide-based medicines, like Lilly's medicines, when it is not. *Mut. Pharm.*, 459 F. Supp. 2d at 933 ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception") (quotations omitted).  This deception is material in that it is "likely to influence the purchasing decision of consumers" because it falsely describes inherent qualities or characteristics of drug products—namely, their safety and effectiveness. *E.g., Clorox*, 398 F. Supp. 3d at 644.

100.    Finally, as discussed in more detail below, Willow's Tirzepatide Drops claims have proximately caused injury to Lilly.  Willow and Lilly are direct competitors in the market for tirzepatide drug products.  Willow's advertising communicates the clear and

---

[76]  Abdulrahman A. Alagga et al., *Drug Absorption,* StatPearls Publishing LLC, (Feb. 27, 2024), https://www.ncbi.nlm.nih.gov/books/NBK557405/.

false message that Willow's Tirzepatide Drops are clinically tested drugs that provide better results than other tirzepatide-based medications, including Lilly's medicines. By falsely comparing its Tirzepatide Drops to Lilly's FDA-approved and clinically tested medicines and communicating that Tirzepatide Drops provide superior results, Willow's false advertising has caused a diversion of sales and lost profits from Lilly on those sales. It has also caused, and continues to cause, harm to Lilly's goodwill, reputation, and standing with the consuming public. Finally, it exposes the public to the unnecessary risks associated with untested and unproven drugs.

### D. Willow's False And Misleading Claims Regarding The "Personalized" Nature Of Its Tirzepatide Treatment

101. Willow also makes numerous claims that its Tirzepatide Treatment is a personalized medicine compounded specifically and individually for each customer when that is simply not the case.

102. Importantly, Willow only recently started touting the benefits of "personalized" medicine. In fact, when it launched the sale of its compounded Tirzepatide Treatment, Willow said nothing about the alleged personalized nature of its product. It was not until FDA issued an order warning compounders that they could not mass produce compounded tirzepatide medicines that Willow decided to falsely market and promote its treatment as "personalized."

103. To begin, compounders cannot mass produce compounded medications; rather, each medicine should be made specifically for the identified patient based on an identified medical need that renders the commercially available FDA-approved medicine inappropriate specifically for them. There is, however, a narrow exception to this rule that allows certain compounders to mass produce copies of FDA-approved drugs when the branded medication appears on FDA's drug shortage list at the time of compounding, distribution, and dispensing. 21 U.S.C. § 353(b).

104. Lilly's tirzepatide medicines meet critical patient needs—MOUNJARO® for type 2 diabetes, and ZEPBOUND® for chronic weight management and sleep apnea in

certain adults. Each faced unprecedented demand for periods after they became commercially available. This led to FDA placing tirzepatide injection products on its "drug shortage" list after they launched.[77]

105. When FDA placed Lilly's medicines on its "drug shortage" list, a cast of so-called "compounders," began mass-manufacturing their own untested, unapproved drug products purporting to contain tirzepatide. These compounded tirzepatide drugs were then mass-marketed and sold by various online retailers across the country, including by Willow.

106. On October 2, 2024, FDA determined that the shortage for tirzepatide injection products, including for Lilly's medicines, had ended.[78] After a group of compounders sued FDA seeking to enjoin its removal of tirzepatide from the shortage list, FDA reconsidered its decision.[79] FDA then conducted a thorough reevaluation of the tirzepatide supply in the United States and determined on December 19, 2024 that the shortage of tirzepatide injection products had been resolved.[80] In so finding, FDA noted that all forms of bulk compounding of tirzepatide would be prohibited after March 19, 2025.[81]

---

[77] FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://www.fda.gov/media/185577/download. When FDA first added tirzepatide injection products to the shortage list, Lilly's MOUNJARO® was its only tirzepatide-based medicine on the market. Lilly's ZEPBOUND® medicine was approved by FDA in November of 2023 and was released commercially during the shortage period.

[78] FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://www.fda.gov/media/185577/download at 1.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 3.

107.   Importantly, as noted above, prior to December 19, 2024, Willow made no mention of its compounded tirzepatide product being a "personalized blend." For instance, Willow advertised its Tirzepatide Treatment as a "standard," non-personalized drug as recently as August 4, 2024.[82]



108.   However, after FDA removed tirzepatide from the shortage list, Willow changed course. As of January 14, 2025—less than a month after FDA's decision—Willow changed all of its branding to suggest that its Tirzepatide Treatment was a "premium treatment" containing a "personalized blend" of ingredients.[83]



---

[82]   Willow, *Compound Tirzepatide Product Page*, https://web.archive.org/web/20240804140329/https://www.startwillow.com/compound-tirzepatide (last visited Sept. 25, 2025).

[83]   Willow, *Compound Tirzepatide Product Page*, https://web.archive.org/web/20250114090657/https://www.startwillow.com/compound-tirzepatide (last visited Sept 25, 2025).

109. On information and belief, Willow did not change the formulation of its Tirzepatide Treatment between August 2024 and the present. Instead, it merely changed its marketing in an apparent attempt to avoid telegraphing to FDA that it is selling mass-produced compounded tirzepatide outside of the shortage.

110. To be clear, Lilly is not in this lawsuit challenging Willow's compliance (or lack thereof) with the FDCA. The point is Willow decided to change its advertising because it believed it needed to fit within an FDA loophole. As a result, in calling its medicine "personalized," Willow's advertising conveys the undeniable message to consumers that the *medication* inside each vial of its Tirzepatide Treatment contains a unique blend of ingredients that is compounded specifically to each patient. It does not.

111. Willow's deception begins on the home page of its website where it expressly and falsely claims that the *medication* it sells "is custom-formulated to match" each patient's "individual health needs," and that it uses "precision medicine to personalize trusted, clinically proven medications."[84]



---

[84]   Willow, *Home Page*, https://www.startwillow.com (last visited Sept. 25, 2025).



112.    Willow's social media similarly communicates that the medicine within the vials of drugs it sells are "personalized" and "tailored to [each customer's] body, lifestyle, and goals."[85]

113.    Willow repeats these false and deceptive claims when promoting its Tirzepatide Treatment in particular.    For example, Willow prominently and falsely promotes its Tirzepatide Treatment on the home page of its website as a "[p]remium weight loss medication with a personalized formulation."[86]

---

[85]    Willow, Facebook (June 28, 2024), https://www.facebook.com/share/p/1AJqwiVES9/.
[86]    Willow, *Home Page*, https://www.startwillow.com/ (last visited Sept. 25, 2025).

114.   Similar statements appear on the landing page for Willow's Tirzepatide Treatment, where (as shown in images above) Willow expressly claims that it is a "personalized GLP-1/GIP treatment, crafted for Willow patients who need a custom formulation tailored to their health goals," and boasts that it offers a "[p]remium, personalized blend," of medicine.

115.   Willow goes on to explicitly tell consumers that every medication itself is individually compounded for that patient.  In particular, Willow falsely claims that every dose of its Tirzepatide Treatment "is compounded with your specific needs in mind," and that its product "isn't a standardized treatment; it's one made just for you.  Because your journey is personal—and your medication should be too":



Every dose is compounded with your specific needs in mind—offering a personalized path to sustainable weight loss and overall well-being. This isn't a standard treatment; it's one made just for you.

Because your journey is personal—and your medication should be too.

116.    These claims convey the literally false message that the medicine contained within each vial of Willow's Tirzepatide Treatment is specially compounded ***after*** an assessment of each patient's particularized needs to contain a unique blend of ingredients. Indeed, according to Willow's advertising, patient needs are assessed and then specialized drugs are compounded containing a customized formulation of ingredients specifically tailored to meet those needs.    These advertisements clearly communicate that the medicine—and not the prescription process needed to obtain the medicine—is specifically formulated for each patient.    *See, e.g., Eli Lilly & Co. v. Adonis Health, Inc.*, No. 25-CV-03536-JST, 2025 WL 2721684, at *8 (N.D. Cal. Sept. 24, 2025) (finding advertising statements promoting compounded drug as a "patient-specific" "tailored" or "individualized treatment" would be "understood by any linguistically competent person" to mean that advertiser "specifically creates individualized medication plans for each patient").

117.    In reality, there is nothing personalized about Willow's medications.    On information and belief, Willow's customers receive the exact same compounded blend of tirzepatide with glycine.    In other words, everyone gets the same medicine regardless of their individual needs or goals.    Neither Willow nor its partner compounding pharmacies compound each dose—or any dose—with a customer's "specific needs in mind"; the doses are prepared at scale in large batches well before they are ever sold to a particular consumer.    Willow does not sell this compounded tirzepatide in any personalized way— instead it offers its compounded tirzepatide to customers in a single formulation and standardized doses.

118.    The standardized, one-size-fits-all nature of Willow's Tirzepatide Treatment can be clearly seen in Willow's "quiz" that urges consumers to "find out if Willow is right for you."[87]    Notably, the quiz includes testimonial videos depicting alleged Willow customers who likewise urge others to take the quiz: "So, I go to the website, ***take a short***

---

[87]    Willow, *Health Quiz*, https://www.startwillow.com/health-quiz (last visited Sept. 28, 2025).

*quiz*, fill out some information about myself and my medical history, and that's it;"[88] "I highly recommend ***taking the quiz*** and seeing if Willow is right for you;"[89] "if you want to start losing weight, ***take the quiz***."[90]

119.    The quiz consists of six questions: (1) "How do you feel about your weight?" ("not so good," "could be better," "pretty good," or "great"); (2) "What is your current weight?"; (3) "What would you like your current weight to be" (answer prompt is a sliding scale that defaults to 75% of the weight entered in response to the prior question); (4) "What benefits would you like to see from weight loss?" (answer prompt instructs the reader to "select all that apply" from a list of the following choices: "more energy," "mobility improvement," "increased confidence," "increased sex drive," "improved heart health," "reduced stress," "lower health risks," "better sleep," and "I don't want any specific benefits,"); (5) "Have you struggled to achieve your weight loss goals with any of these methods?" (answer prompt instructs the reader to "select all that apply" from a list of the following choices: "dieting," "fasting," "calorie counting," "medication," "exercise," "bariatric surgery," "personal trainer," "meal plans," and "I have never tried to lose weight,"); and (6) "Are you familiar with GLP-1 weight loss medication" ("Yes, I've heard of GLP-1," or "No, I'm not familiar with GLP-1.").[91]   The prompt for each question is attached hereto as **Exhibit C.**

120.    After responding to all six questions, Willow redirects the user to a page containing a loading progress bar.  The statement "All set!  We are reviewing your answers to make sure we can offer you the best possible treatment," appears above the progress bar and a testimonial from an alleged Willow patient claiming "[i]t really is a personalized and

---

[88]   Willow, *Quiz Results Page*, https://www.startwillow.com/results-familiar-with-glp-1 (video on the far left under the header "Hear from our patients") (last visited Sept. 28, 2025).

[89]   *Id.*

[90]   *Id.*

[91]   Willow, *Health Quiz,* https://www.startwillow.com/health-quiz (last visited Sept. 28, 2025).

comprehensive program" appears to the right.[92]   The progress bar takes long enough to load to convey the impression that Willow is assessing the responses provided to the quiz.



121.    Once the progress bar reaches 100%, the user is redirected to a page proclaiming "Great news!  We think we can help you.  Based on your answers, you may be a candidate for our treatment plans."  Further down on the same page, Willow suggests its Tirzepatide Treatment.[93]



---

[92]  Willow, *Health Quiz,* https://www.startwillow.com/health-quiz (last visited Sept. 28, 2025).

[93]  Willow, *Quiz Results Page,* https://www.startwillow.com/results-not-familiar-with-glp-1 (last visited Sept. 28, 2025).

122.    Despite the appearance of assessing individual patient needs, Willow's quiz does nothing of the sort.  Instead, it appears that regardless of the responses to the quiz's question prompts, Willow determines that the user is a "candidate for [Willow's] treatment plans" and recommends its Tirzepatide Treatment.[94]

123.    For example, in assessing a fictional patient profile—one where the patient reported (i) feeling "great" about their weight, (ii) weighing 100lbs, (iii) seeking to maintain their weight, (iv) not seeking any specific benefits from weight loss, (v) had never tried to lose weight, and (vi) had not heard of GLP-1s—Willow concluded "based on your answers you may be a candidate for our treatment plans" and recommended Tirzepatide Treatment.

124.    Moreover, Willow reached the same conclusion after assessing quiz results from the following fictional patient profiles:

- An individual weighing 300 pounds seeking to lose 75 pounds;
- An individual weighing 100 pounds seeking to maintain their weight; and
- An individual weighing 1 pound seeking to lose 0.25 pounds.[95]

125.    The answers to the quiz questions that resulted in these conclusions are attached hereto as **Exhibit D**.

126.    While Willow claims it assesses each patient's individualized needs, in reality, it generates the same results and the same recommendation for the same Tirzepatide Therapy product for each patient regardless of how they described their needs in Willow's quiz.

---

[94] If a user answers the question "Are you familiar with GLP-1 weight loss medication" using the answer prompt "[y]es, I've heard of GLP-1," the website ultimately redirects the user to a page that does not specifically reference Tirzepatide Treatment but still claims that the user is a candidate for Willow's drugs and provides information about the onboarding process. Willow, *Quiz Results Page,* https://www.startwillow.com/results-familiar-with-glp-1 (last visited Sept. 28, 2025).

[95] Willow reached the same conclusion for each of these individuals regardless of their answers to questions 1 ("How do you feel about your weight?"), 4 ("What benefits would you like to see from weight loss?"), and 5 ("Have you struggled to achieve your weight loss goals with any of these methods?").

127.   Moreover, while Willow's advertising suggests that the medicine is "personalized" because Willow may include additives and ingredients not found in Lilly's FDA-approved tirzepatide-based medicines, that does not "fix" the false nature of Willow's statements.  Upon information and belief, Willow is not selecting additives based on each individual patient's needs; instead, they are using mass produced compounded tirzepatide products with additives from different compounding pharmacies regardless of individual patient needs.

128.   On information and belief, Willow initially used Empower Pharmacy to compound its Tirzepatide Treatment.  During this time, each vial of Tirzepatide Treatment contained tirzepatide mixed with a niacinamide (vitamin B3) additive; more recently, Willow changed its compounding pharmacy to Red Rock Pharmacy and each vial of its Tirzepatide Treatment now contains tirzepatide mixed with a glycine additive.  Again, neither Empower nor Red Rock were compounding medicine for an individual Willow patient; rather both pharmacies are mass producing the same medicine for all.

129.   At base, Willow is not selling an individualized tirzepatide product with an additive compounded for an individual, identified patient's specific medical needs.  Moreover, the addition of those additives further reinforces the fact that Willow cannot rely on Lilly's clinical studies or their outcomes, as the safety and effectiveness of those additives were never evaluated in Lilly's studies.

130.   Even worse, Willow's advertising explicitly and implicitly suggests that its "personalized" medicine is better for the patient than standardized medicines like Lilly's MOUNJARO® and ZEPBOUND®.  For example, as shown above, Willow specifically compares its personalized medicine to "standard treatment" telling customers that their medication should not be standard.  Further, Willow boasts that because its Tirzepatide Treatment is a "premium personalized blend" it offers better results.  As discussed in detail above, that is once again false.

131.   In short, Willow's personalization claims are literally false, as are its claims that Willow's Tirzepatide Treatment is better than Lilly's "standard" medicines because of

the alleged personalized nature of Willow's medicine. As a result, consumers who view Willow's advertising will be deceived into believing that Willow's Tirzepatide Treatment is unique to them, and superior to other tirzepatide-based medicines, like Lilly's medicines, when it is neither of those things. *Mut. Pharm.*, 459 F. Supp. 2d at 933 ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception") (quotations omitted). This deception is material in that it is "likely to influence the purchasing decision of consumers" because it falsely describes inherent qualities or characteristics of drug products—namely, their effectiveness. *E.g.*, *Clorox,* 398 F. Supp. 3d at 644.

132. Finally, as discussed in more detail below, Willow's personalization claims have proximately caused injury to Lilly. Willow and Lilly are direct competitors in the market for tirzepatide drug products. Willow's advertising communicates the clear and false message that Willow's Tirzepatide Treatment is superior to Lilly's FDA-approved and clinically tested medicine because it offers an individualized option tailored to each individual patient's needs. By falsely comparing its Tirzepatide Treatment to Lilly's FDA-approved and clinically tested medicines and communicating that Tirzepatide Treatment provides superior results, Willow's false advertising has caused a diversion of sales and lost profits from Lilly on those sales. It has also caused, and continues to cause, harm to Lilly's goodwill, reputation, and standing with the consuming public. Finally, it exposes the public to the unnecessary risks associated with untested and unproven drugs.

## IV.    WILLOW'S UNLAWFUL CONDUCT HAS OR IS LIKELY TO CAUSE COMMERCIAL INJURY AND HARM TO LILLY

133. As this court previously found, Willow and Lilly are direct competitors in the marketplace. *See* Dkt. 47 at 7 ("As such, the Court concludes that Plaintiff has sufficiently alleged that Defendant and Plaintiff are direct competitors."). Indeed, Willow not only directly competes with Lilly for customers interested in GLP-1 treatment, but Willow's treatment also purports to contain the same active ingredient as Lilly's MOUNJARO® and ZEPBOUND®. Thus, Lilly has standing to bring this challenge to Willow's advertising.

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011) ("[W]hen plaintiff competes directly with defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing."); *Adonis Health, Inc.*, 2025 WL 2721684, at *3 ("Lilly and Henry are direct competitors in the market for tirzepatide products because both Henry and Lilly market and sell tirzepatide-containing drugs. . .to the same potential customers, i.e., they vie for the same dollars from the same consumer group.").

134. Lilly's injury is concrete and particularized. ***First***, Willow's false advertisements create an association in the minds of consumers between its drugs and Lilly's MOUNJARO® and ZEPBOUND® that continues to harm Lilly's goodwill and reputation. ***Second***, Willow's false and misleading advertisements are the proximate cause of lost sales of its MOUNJARO® and ZEPBOUND®.

### A. Willow's Advertisements have Caused Harm to Lilly's Goodwill and Reputation

135. Willow's false and misleading statements also cause harm to Lilly's reputation and goodwill. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 138, 134 S. Ct. 1377, 1393, 188 L. Ed. 2d 392 (2014) (Lanham Act confers standing on a plaintiff where "the defendant damages the [plaintiff's] product's reputation by, for example, equating it with an inferior product.").

136. As an initial matter, under the Trademark Modernization Act of 2020, Congress amended Section 34(a) of the Lanham Act to clarify and codified that there is a presumption of irreparable harm in requests for injunctive relief under the Lanham Act, and that extends to all false advertising claims brought under the Lanham Act, including literally false claims, impliedly false claims, and claims about a defendant's own products or services. Thus, when Lilly proves Willow's claims false, it is entitled to a presumption of harm.

137. Moreover, here, Willow is making express claims of superiority over Lilly's "standard" tirzepatide-based products, promising better results from Willow's product,

thus the harm to Lilly's reputation is real. *Guardant Health, Inc. v. Natera, Inc.*, No. 21-CV-04062-EMC, 2025 WL 2106522, at *17 (N.D. Cal. July 28, 2025) (directly comparative false advertising creates presumption of harm).

138.    Additionally, on information and belief, when consumers experience any negative results from Willow's Tirzepatide Treatment, they conclude that any tirzepatide is either unsafe or ineffective.  Worse still, if consumers are harmed using compounded tirzepatide products, including by becoming underweight or experiencing the harmful side effects associated with untested and unregulated drugs, consumers will draw unwarranted conclusions about the safety and effectiveness of Lilly's FDA-approved tirzepatide medicines particularly because Willow uses Lilly's clinical testing in its marketing.

139.    In fact, consumers have contacted Lilly to report adverse events from taking compounded products.  Consumers have also reported that taking compounded tirzepatide has resulted in trips to the emergency room and hospitalization.  They have also reported receiving compounded tirzepatide without information regarding proper and safe administration and storage of the medicine.    In multiple such cases, consumers have reported that they were not aware they had been taking compounded tirzepatide.  Consumers have also reported feeling scammed after finding out that they were not taking Lilly's FDA-approved medicines.

140.    None of this is surprising.  Independent medical studies have consistently shown "significantly higher reporting odds of several [adverse events], including abdominal pain, diarrhea, nausea, suicidality, and cholecystitis," as well as "higher reporting odds of hospitalization, related to GI events" for users of compounded drugs.[96] Yet false advertising of the kind that Willow engages in proximately causes customers to associate their negative experiences with compounded tirzepatide—like Willow's Tirzepatide Treatment—with Lilly.  The frequency with which Lilly receives these calls

---

[96]  Kenneth L. McCall et al., *Safety analysis of compounded GLP-1 receptor agonists: a pharmacovigilance study using the FDA adverse event reporting system,* Expert Opinion on Drug Safety (Apr. 29, 2025), https://pubmed.ncbi.nlm.nih.gov/40285721/.

and the severity of the events reported makes clear that false promises made by compounded tirzepatide drug retailers like Willow cause serious harm to the reputation and goodwill that Lilly has built in its brand.

### B. Willow's False Advertisements Proximately Caused Lilly's Harm Through Lost Sales

141.    The widespread and prolific false advertising of compounded drug products, including by Willow, has diverted sales from Lilly.  In December 2024, the Association for Pharmacy Compounding (APC) acknowledged that forty compounding pharmacies had "collectively dispensed 125,000 compounded tirzepatide prescriptions over the past month."[97] According to APC, this represented "a fraction of compounders preparing these medications."[98]  To put this into perspective, FarmaKeio, a compounding pharmacy stated that it would suffer "$1,750,000-$2,000,000 in lost revenue per month" due to FDA removing tirzepatide from the shortage list.[99]

142.    Lilly has lost sales due to Willow's false and misleading advertisements in particular.  Lilly and Willow both offer tirzepatide-based drugs at similar prices—the starting dose of Willow's Tirzepatide Treatment at $399/month[100] indeed costs more than the starting dose of a monthly supply of single-use vials of Lilly's ZEPBOUND® medicine at $349.[101]  Given this, customers seeking a tirzepatide-based medication are likely to make choices based on factors other than pricing, including comparative safety and effectiveness. And even if Willow's products were to be offered for less than Lilly's, many consumers

---

[97]   FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://www.fda.gov/media/185577/download (quoting Letter from Tenille Davis, OFA Chief Advocacy Officer to FDA Commissioner Robert Califf et al. (Dec. 17, 2024)).

[98]   *Id.*

[99]   *Decl. of Dan DeNeui in Supp. of Pls.' Mot. for Prelim. Injun. and Stay Pending Review, Outsourcing Facilities Ass'n et al.*, 24-cv-953, Dkt. No. 67, ¶ 19 (App. 002-003) (N.D. Tex. Jan. 28, 2025).

[100]   Willow, *Compound Tirzepatide Product Page,* https://www.startwillow.com/compound-tirzepatide (last visited Sept. 28, 2025).

[101]  LillyDirect, *Zepbound Page*, https://www.lilly.com/lillydirect/medicines/zepbound.

would still be misled into purchasing Willow's compounded drugs over Lilly's medications. Willow falsely advertises its Tirzepatide Treatment as clinically tested like Lilly's medicines while offering superior results and benefits. But for these false promises, consumers would choose Lilly's FDA-approved, clinically tested, proven safe and effective medications.

## FIRST CAUSE OF ACTION
### False or Misleading Advertising and Promotion
### in Violation of 15 U.S.C. § 1125(a)(1)(B)

143.   Lilly repeats and realleges each and every allegation above as if fully set forth herein.

144.   Willow's commercial advertising claims described herein are false and misleading in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Willow falsely and deceptively tells consumers that its Tirzepatide Treatment and Tirzepatide Drops have been subject to testing that shows clinically proven results as safe and effective, falsely and deceptively promotes its Tirzepatide Treatment as offering superior results to Lilly's FDA-approved tirzepatide medications, and falsely and deceptively promotes its tirzepatide medicines as personalized and specifically and "clinically" compounded for each individual patient when they are not.

145.   Willow has made materially false statements to sell its Tirzepatide Treatment and its Tirzepatide Drops. These statements have influenced and are likely to continue to influence consumers' purchasing decisions—specifically, decisions to purchase Willow's Tirzepatide Treatment and Tirzepatide Drops instead of Lilly's FDA-approved medicines. Willow is steering patients with serious diseases like diabetes and obesity away from obtaining safe, effective, available, and FDA-approved medicines. Willow's unlawful conduct is putting health, safety, and lives at risk.

146.   Willow's advertisements and business practices actually deceive or have the tendency to deceive consumers.

147.   Willow has caused its false statements to enter interstate trade or commerce.

148.  As a direct and proximate result of Willow's false and deceptive campaign, Lilly is suffering immediate and continuing irreparable injury for which no adequate remedy at law exists.

149.  As a direct and proximate result of Willow's false and deceptive campaign, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the loss of goodwill.

150.  Given Willow's conduct, this is an exceptional case under 15 U.S.C. § 1117.

151.  Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including disgorgement of Willow's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

## JURY DEMAND

Lilly hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Lilly prays that this Court enter judgment in Lilly's favor on its claims and award Lilly relief including:

1.  An order declaring that Willow engaged in false advertising, in violation of 15 U.S.C. § 1125(a)(1)(B).

2.  An injunction preliminarily and then permanently enjoining and restraining Willow, and its officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them from:

     i.     Marketing, advertising, or promoting Willow's Tirzepatide Drops in any manner that states or suggests Tirzepatide Drops are clinically tested, proven safe and effective at weight loss, and superior to Lilly's or any other tirzepatide-based product;

     ii.     Marketing, advertising, or promoting Willow's Tirzepatide Treatment in any manner that states or suggests Tirzepatide Treatment is clinically tested, proven safe and effective at weight loss, and superior to Lilly's or any other tirzepatide-based product;

     iii.     Claiming or representing that Willow's tirzepatide drugs are custom-made for a patient's specific needs; and

   iv. Engaging in any acts of false advertising or unfair competition with respect to any tirzepatide product.

  3. An order requiring Willow, and its officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them, to engage in corrective advertising by informing consumers that:

   i. Willow's Tirzepatide Drops and Tirzepatide Treatment have never been demonstrated to be safe or effective;

   ii. Willow's Tirzepatide Drops and Tirzepatide Treatment have never been studied in clinical trials;

   iii. Willow's Tirzepatide Drops and Tirzepatide Treatment do not have any proven therapeutic effect;

   iv. Willow's Tirzepatide Drops and Tirzepatide Treatment have not been clinically shown to be as effective as, or more effective than, any FDA-approved tirzepatide medicines; and

   v. Willow's Tirzepatide Drops and Tirzepatide Treatment are not custom-made, uniquely made, or personalized for an individual patient.

  4. An order directing Willow to file with this Court and serve on Lilly's attorneys, within thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the Court's injunction.

  5. An order requiring Willow to account for and pay to Lilly any and all profits arising from the foregoing acts of false advertising.

  6. An order requiring Willow to pay Lilly compensatory damages in an amount as yet undetermined caused by the false advertising for payment to Lilly in accordance with 15 U.S.C. § 1117.

  7. An order for pre-judgment and post-judgment interest on all damages.

  8. An order finding that Willow's actions are exceptional under 15 U.S.C. § 1117.

  9. An order requiring Willow to pay Lilly's costs and attorneys' fees in this action pursuant to 15 U.S.C. § 1117.

10.    Other relief as the Court may deem appropriate.

*[Signature page follows.]*

Dated:  September 29, 2025          Respectfully submitted,

/s/ David I. Horowitz
David I. Horowitz

James F. Hurst (admitted *pro hac vice*)
Diana M. Watral (admitted *pro hac vice*)
Ryan Moorman (admitted *pro hac vice*)
Robin McCue admitted (*pro hac vice*)
James R.P. Hileman (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
james.hurst@kirkland.com
diana.watral@kirkland.com
ryan.moorman@kirkland.com
jhileman@kirkland.com

Joshua L. Simmons (admitted *pro hac vice*)
Jeanna M. Wacker (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com

David I. Horowitz (S.B.N. 248414)
Yungmoon Chang (S.B.N. 311673)
KIRKLAND & ELLIS LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
dhorowitz@kirkland.com
yungmoon.chang@kirkland.com

*Attorneys for Plaintiff*
*ELI LILLY AND COMPANY*